## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **IN RE LORI BETH PIGG,** | ) |
| | ) |
| | ) **Case No. 14-50266-can7** |
| Debtor. | ) |
| ———————————————— | ) |
| | ) |
| **IN RE JESSICA LENORE HARKINS,** | ) |
| | ) |
| | ) **Case No. 14-50416-can7** |
| Debtor. | ) |
| ———————————————— | ) |

## MEMORANDUM OPINION GRANTING UNITED STATES TRUSTEE'S MOTION FOR SANCTIONS AND ORDERING SANCTIONS ON COURT'S OWN INITIATIVE

Attorney Michael McCrary appeared before the Court for a final, evidentiary hearing in response to two sanctions motions and the Court's Order to Show Cause why additional sanctions should not be imposed. Mr. McCrary's actions, admissions, and arguments did little to persuade the Court that he should escape sanctions. Rather, the Court believes that sanctions and disgorgement totaling $8,649.50[1] are warranted, and that Mr. McCrary should be referred to the appropriate disciplinary authorities for the admitted ethical violations that damaged his clients, other parties in interest, and the integrity of the bankruptcy system.

### *Joint Procedural Background*

Mr. McCrary is an experienced bankruptcy lawyer, representing consumer debtors in Chapters 7 and 13 in the various divisions of the Western District of Missouri. He is also the bankruptcy attorney who filed Chapter 7 petitions for Lori B. Pigg and Jessica L. Harkins.

The Office of the United States Trustee (UST) filed motions for disgorgement and sanctions against Mr. McCrary in both the *Pigg* and *Harkins* cases. The UST alleged that Mr.

---

[1] The amounts are itemized, *infra* at page 38–39.

McCrary violated his duties under 11 U.S.C. § 707(b)(4) when he certified that the *Pigg* and *Harkins* schedules and statements were accurate, despite knowing that certain nonexempt assets and avoidable transfers had not been disclosed.  The UST alleged that Mr. McCrary's knowing failure to schedule nonexempt assets and to list avoidable transfers, among other failures, not only violated his duties under § 707(b)(4), but also warranted disgorgement of his attorney fees and imposition of a monetary penalty as a sanction.

The Court consolidated the two motions for a final, evidentiary hearing. Before the final hearing, the Court on its own motion issued an order to show cause ("OSC") in the *Harkins* case why additional sanctions should not be imposed. At the conclusion of the hearing, the Court took the matter under advisement. The Court has jurisdiction over these proceedings under 28 U.S.C. § 1334(b) and the proceedings are core. 28 U.S.C. § 157(b)(2)(A). The facts of each motion and the OSC will be addressed in turn.

### Pigg Case

### Findings of Fact

### Ms. Pigg's Initial Contact With Mr. McCrary

On February 27, 2015, Lori Pigg called Mr. McCrary's office and spoke to him about filing bankruptcy. His handwritten notes from the conversation as supplemented by a staff member were admitted into evidence without objection.[2] The notes indicate that Ms. Pigg had

---

[2]      Exhibit 1 was not premarked as an exhibit, but was introduced by UST counsel at the hearing without objection. Counsel represented that Exhibit 1 was a note from Mr. McCrary's file for Ms. Pigg; UST Counsel had Ms. Pigg's original file in her possession at the hearing.  Mr. McCrary also stated several times that he no longer had Ms. Pigg's file. The Court is concerned that Mr. McCrary handed over Ms. Pigg's entire original file to the UST at the UST's request, without first seeking a protective order from this Court, apparently failing to recognize his ethical duty of confidentiality to his client under Missouri Rule of Professional Conduct ("MRPC") 4.1-6. Comment 11 to Rule 1-6 states: "A lawyer may be ordered to reveal information relating to the representation of a client by a court or by another tribunal or governmental entity claiming authority pursuant to other law to compel the disclosure. Absent informed consent of the client to do otherwise, the lawyer should assert on behalf of the client all nonfrivolous claims that the order is not authorized by other law or that the information sought is protected against disclosure by the attorney-client privilege or other applicable law. In the event of an adverse ruling, the lawyer must

received a $10,000 tax refund,[3] had sent a $2,000 check to "Rainbow," and that Mr. McCrary

advised her to stop payment on the check to "Rainbow" if possible.

### The Filing of Ms. Pigg's Petition, Schedules & Statements

Mr. McCrary electronically filed a voluntary petition for Chapter 7 relief for Ms. Pigg on

May 30, 2014, or approximately three months after she first contacted him. The petition was e-

signed[4] by Mr. McCrary, and states below his signature: "In a case in which § 707(b)(4)(D)

applies,[5] this signature also constitutes a certification that the attorney has no knowledge after an

inquiry that the information in the schedules is incorrect." When filing the petition, Mr. McCrary

also certified to the Court that he had executed the Rights and Responsibilities Agreement

("RRA") pursuant to Local Rule ("L.R.") 2016-1.D.[6]  Mr. McCrary's Rule 2016(b) statement

filed with the petition disclosed that he had agreed to charge Ms. Pigg $1,300 for his legal

services for filing a Chapter 7 bankruptcy. *See* Fed. R. Bankr. P. 2016(b).  Ms. Pigg's statement

of financial affairs ("SOFA") disclosed that she paid Mr. McCrary $1,300 in March 2014.[7]

---

consult with the client about the possibility of appeal to the extent required by Rule 4-1.4. Unless review is sought, however, Rule 4-1.6(b)(4) permits the lawyer to comply with the court's order." In this case, the UST filed a "Notice" of examination of Ms. Pigg under Rule 2004; there was not a court order entered requiring Ms. Pigg or Mr. McCrary to produce Ms. Pigg's file. No evidence was presented on this issue, however, and the Court does not find that Rule 4.1-6 was indeed violated.

[3]        As will be discussed later, she actually received $10,355 in refunds.

[4]        The Western District of Missouri's Local Rule ("L.R.") 9011-4 provides that "[t]he attorney's use of the login and password issued for ECF shall constitute the signature of the attorney and client(s) for all purposes including Fed. R. Bankr. P. 9011."

[5]        As noted below, § 707(b)(4)(D) applies to debtors whose debts are primarily consumer debts. It is undisputed that Ms. Pigg's debts are consumer debts such that § 707(b)(4)(D) applies to Mr. McCrary.

[6]        *See* Chapter 7 Rights and Responsibilities Agreement ("RRA"), *available at* www.mow.uscourts.gov/bankruptcy/attorneys.html. The RRA sets out both a debtor's and her attorney's duties and responsibilities. *See* Local Form MOW 2016-1.3. Under L.R. 2016-1.D, debtors' attorneys who certify that they and their clients have executed the RRA are exempt from the requirement of seeking court approval of their attorney fees, so long as the attorney fees do not exceed a certain amount (the "no-look" fee). *See In re Mahannah*, 397 B.R. 474, 480 (Bankr. W.D. Mo. 2008). One of the purposes of the RRA is to ensure that debtors' attorneys do not inappropriately "unbundle" legal services for the filing of a bankruptcy.

[7]        The Court notes that Mr. McCrary's Rule 2016(b) disclosure excluded from his representation certain services such as preparing and filing reaffirmation agreements, lien avoidances, and relief from stay motions, among other excluded services. Such exclusions constitute improper unbundling and are not authorized under the RRA, which at the time the case was filed authorized only adversary proceedings to be excluded (conversions and appeals may now be appropriately excluded). In addition, his Rule 2016(b) disclosure did not disclose that Mr. McCrary

Ms. Pigg's Schedule B revealed she had $10 in cash, $100 in a bank account, and minor personal property of minimal value, including $1,200 in household goods and furnishings. Her Schedule F disclosed that she owed $2,000 to a law firm collecting on account of a Rainbow Vacuum,[8] and her SOFA disclosed the $1,300 paid to Mr. McCrary's law firm in March 2014. Notably, however, Ms. Pigg listed no payments to or for the benefit of creditors or insiders in response to SOFA Questions 3.a and b, and no transfers outside the ordinary course under SOFA Question 10.a.

In reality, however, Ms. Pigg had received and deposited into her bank account federal and state tax refunds totaling $10,355 within the 90 days before she filed bankruptcy. Ms. Pigg had not only used the tax refunds to pay Mr. McCrary's attorney fees, but had also paid $3,654.53 for the benefit of one of her mother's creditors, Putnam County State Bank, and $2,000 to repay a loan to her sister. As will be discussed in more detail below, Mr. McCrary has admitted that he knew about the tax refunds and the payments to the family members before he filed Ms. Pigg's bankruptcy petition, schedules and statements, and that he advised her not to disclose the transfers.

### *Procedural History of the Pigg Case*

---

charges $150 for the filing of amendments to add creditors, according to the letter attached to Exhibit 1. The filing of incomplete or inaccurate disclosures may be grounds for sanctions, including disgorgement. *See generally Walton v. LaBarge (In re Clark)*, 223 F.3d 859 (8th Cir. 2000); *Schroeder v. Rouse (In re Redding)*, 265 B.R. 601 (8th Cir. B.A.P. 2001). Nonetheless, the Court has no evidence that Mr. McCrary inappropriately excluded services or charged Ms. Pigg for additional services in contravention of his Rule 2016(a) disclosure and the RRA.

[8]     Mr. McCrary did not schedule the original creditor, Rainbow, at Rainbow's address. The Court notes that since the Trustee has now opened an estate with assets, if the law firm collecting for the creditor did not have authority to receive notice on behalf of that creditor, the notice to the law firm may not be effective to discharge that creditor. 11 U.S.C. § 523(a)(3)(A); *Preston v. GMPQ, LLC (In re Preston)*, 395 B.R. 658, 663–64 (Bankr. W.D. Mo. 2008) (discussing when notice to an attorney is imputed to a creditor for purposes of whether a willful violation of the stay occurred). *See also In re Stacy*, 405 B.R. 872 (Bankr. N.D. Ohio 2009) (notice of bankruptcy "in care of" a collector does not comport with the Code or Rules, which require that the creditor be scheduled). The Bar Date (deadline to file claims) expired on November 25, 2014, and neither the original creditor nor the law firm filed a claim. There is no evidence of whether the failure to schedule the creditor appropriately is the fault of Mr. McCrary or his client; at a minimum, however, it indicates sloppiness on Mr. McCrary's part since he clearly knew about this creditor.

Bruce E. Strauss was duly appointed as Chapter 7 Trustee in Ms. Pigg's case. On July 6, 2014, he requested the Court issue an OSC for Ms. Pigg's failure to provide the most recent tax returns to him before the § 341 meeting of creditors. Mr. McCrary responded to the OSC, asserting that a staff person had tried to timely upload the documents to the Trustee's document collection system but was apparently unaware that the upload had failed. Mr. McCrary also alleged that the Trustee had received the tax returns on or about July 9.  In the meantime, though, the initial meeting set for July 11, 2014 had to be continued another three weeks, to August 1, since the Trustee did not have the returns in time to review them before the meeting.[9]

Ms. Pigg and Mr. McCrary both attended the continued meeting of creditors on August 1. In Mr. McCrary's presence, the Trustee asked Ms. Pigg under oath if she had any changes or corrections to her schedules or statements. Ms. Pigg testified there were none. Mr. McCrary did not correct her testimony.

Later in the hearing, the Trustee asked Ms. Pigg how she had been able to pay her attorney fees. Ms. Pigg answered that the funds came from her tax refunds. That answer prompted the Trustee to ask what Ms. Pigg had done with the rest of her tax refund money. Ms. Pigg truthfully responded that she had paid her mother and sister. The Trustee then asked Ms. Pigg to amend her SOFA to disclose these transfers. But when another three weeks passed without the SOFA amendments having been filed, the Trustee was compelled to file a motion to extend his time to object to Ms. Pigg's discharge. The Court granted the Trustee's motion, extending the deadline for another 30 days, from September 12 to November 8, 2014.[10]

---

[9]      The Court makes no finding about the accuracy of Mr. McCrary's representation in response to the OSC, but recites this procedural background as another example of the needless delays that occurred in this case that appear to fall at the feet of Mr. McCrary.  Section 521(e)(2)(A)(i) requires that an individual Chapter 7 or 13 debtor provide the Trustee the most recent tax return "not later than 7 days before the date first set for the first meeting of creditors." Failure to comply with this requirement may result in dismissal of the case. 11 U.S.C. § 521(e)(2)(B).

[10]      A debtor's failure to provide documents or other information requested by the Trustee may constitute grounds to deny discharge under § 727(a)(4)(D).

A month later (or about 90 days after the case was filed), Mr. McCrary filed Ms. Pigg's amendments to the SOFA, disclosing for the first time the extent and nature of the transfers she had made with her tax refunds. The amendments detail not only the transfers to Ms. Pigg's mother and sister, but other previously undisclosed transfers within the 90 days before filing as well.[11]

Based on the amendments, the Trustee filed adversary complaints against Ms. Pigg's mother and sister (Adversary Nos. 14-5018 and 14-5019), seeking to recover the transfers as insider preferences under 11 U.S.C. § 547(b). The Trustee ultimately obtained default judgments of $3,654.53 and $1,900[12] against Ms. Pigg's mother and sister respectively, in addition to court costs and prejudgment interest. The Trustee represented to the Court at the sanctions hearing that Ms. Pigg's sister was making small monthly payments toward satisfaction of the judgment against her, but that the judgment against Ms. Pigg's mother was essentially uncollectible.

In the meantime, the extended deadline for the Trustee to object to Ms. Pigg's discharge expired, and Ms. Pigg received her discharge. At the sanctions hearing, the Court questioned the Trustee about why he had not filed an objection to Ms. Pigg's discharge for her false testimony and failure to disclose the transfers made with the tax refunds in her original SOFA. The Trustee candidly acknowledged that although Ms. Pigg deserved some blame for the false schedules and testimony, he believed Ms. Pigg was an unsophisticated young woman who had relied on Mr.

---

[11]     Ms. Pigg listed five previously undisclosed transfers to noninsiders in February 2014 in response to SOFA Question 3.a: $1,068 to a physician, $218 to a tire shop, $177.82 for insurance, $226.28 for taxes, and $800 to the tax preparer. SOFA Question 3.a requests a listing of all payments on loans, installment purchases of goods or services, and any other debts made within the 90 days, "unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600." Trustees may not avoid a preferential transfer if the aggregate value of the property is less than $600. 11 U.S.C. § 547(c)(8).  *See generally In re Pierce*, 779 F.3d 814 (8th Cir. 2015). Here, it is not clear why the two transfers in excess of $600 were not disclosed initially, nor is it clear why the other three transfers were even disclosed at all.  There was no evidence about whether the other transfers were potentially avoidable.

[12]     The SOFA stated that the transfer to Ms. Pigg's sister was actually for $2,000; the Trustee's motion for default judgment requested a judgment of only $1,900, stating that Ms. Pigg's sister had made one $100 payment to the estate.

McCrary. The Trustee based this belief on the fact that Ms. Pigg did not attempt to evade the Trustee's questions about the refunds, and that she had been cooperative with him once she found out what information he wanted. The Trustee therefore did not believe an objection to Ms. Pigg's discharge would be appropriate under the circumstances. There was no evidence before the Court on the issue of Ms. Pigg's intent in not disclosing the transfers initially; the Court otherwise has no reason to disagree with the Trustee's decision not to object to Ms. Pigg's discharge.

### *The UST's  Motion for Disgorgement & Sanctions*

The UST examined Ms. Pigg pursuant to Fed. R. Bankr. P. 2004, and then filed a motion for disgorgement and sanctions against Mr. McCrary. The Motion cited testimony during Ms. Pigg's Rule 2004 examination that she told Mr. McCrary – before she filed bankruptcy – about the repayments to family members. And that she had provided Mr. McCrary copies of her bank statements showing the payments. The UST alleged that despite this knowledge, Mr. McCrary failed to properly advise Ms. Pigg about the receipt and expenditure of the tax refunds; failed to disclose the payments from the refunds to the family members and other creditors on the SOFA; failed to advise Ms. Pigg that the transfers could be recovered by the Trustee; and failed to amend the schedules until after the Trustee discovered the transfers. The UST sought disgorgement of Mr. McCrary's attorney fees under § 329, in addition to sanctions in the suggested amount of $1,500 for violation of § 707(b)(4).

### *Mr. McCrary's Response to the UST's Motion*

Mr. McCrary filed a response admitting 31 of the UST's 35 allegations, including the allegations that he (1) knew of the insider transfers; (2) discussed the transfers with Ms. Pigg; (3) reviewed bank statements showing the transfers; (4) did not advise Ms. Pigg that the transfers

were avoidable; (5) knew that the transfers should have been disclosed; and (6) failed to ensure the transfers were disclosed in the SOFA or in Ms. Pigg's testimony at the § 341 meeting.[13] Mr. McCrary also admitted that by these failures he had violated § 704(b)(4)(D), that his fees should be disgorged as excessive under § 329(b), and that a $1,500 sanction should be imposed.

### The Status Conference Before the Final Hearing in Pigg

The Court held a phone status conference before the scheduled evidentiary hearing on the UST's motion. At the conference, Mr. McCrary confirmed that he did not dispute the disgorgement or sanction, but stated he had not yet disgorged his fees or paid the sanction because he was waiting for the Court to order him to do so. He also expressed his view that the Court did not need to hold a hearing since he was not contesting the UST's Motion. The Court replied that since Mr. McCrary had admitted all the essential allegations, the Court would not hold an evidentiary hearing on the underlying allegations, but would give Mr. McCrary the opportunity to present evidence in mitigation of a possible disciplinary referral by the Court. Mr. McCrary asked to have that opportunity at the final hearing.

### Evidence at the Pigg Final Hearing

At the final evidentiary hearing, Mr. McCrary elected to represent himself and chose not to introduce any exhibits, but made statements and arguments to the Court. He was also sworn in and cross-examined at the UST's request. Mr. McCrary did not deny that he knew about the transfers Ms. Pigg made with her tax refund money before he prepared and filed the SOFA. He attempted to defend his nondisclosure of the transfer for the benefit of Ms. Pigg's mother,

---

[13]     The only essential allegation that Mr. McCrary denied in his response to the UST's motion was whether Ms. Pigg filed bankruptcy within 90 days of having made transfers for the benefit of her mother and sister. That denial makes no difference here. Regardless of whether Ms. Pigg paid her family members inside or outside the 90 days, the transfers were still indisputably within a year before the filing and thus avoidable as preferential transfers under 11 U.S.C. § 547(b)(4)(B). The transfers were thus required to be disclosed under either or both of SOFA Questions 3.a (within 90 days) and 3.c (insider payments within a year). And, since payments to family members are rarely "ordinary course" transfers, as discussed below, the transfers should likewise have been disclosed in response to SOFA Question 10.a.

however, saying that although he had "processed" the information, he thought the payment was for "disguised rent" which did not need to be disclosed. Mr. McCrary did not explain or address his failure to disclose the other omitted transfers, including the $2,000 loan repayment to Ms. Pigg's sister.  He did not explain or address why he allowed Ms. Pigg to testify falsely that her schedules and statements were accurate when he knew otherwise. He did not explain or address the three-month delay in amending the SOFA to finally disclose the transfers.

The Court questioned Mr. McCrary about his apparent belief that "disguised rent" for the benefit of a family member need not be disclosed in the Schedules or the SOFA. The Court queried that if Ms. Pigg's mother was indeed Ms. Pigg's landlord, then should not the lease agreement have been listed on Ms. Pigg's Schedule G of Unexpired Leases and Executory Contracts? In response, Mr. McCrary said he did not think landlords were creditors, so that, in his mind, a payment to a landlord within the 90 days before bankruptcy would not have to be disclosed.[14]

In response to the Trustee's questioning on cross-examination, Mr. McCrary also made two other important admissions. He admitted that he told the Trustee after the § 341 meeting that Ms. Pigg had not told him about the transfers, which was a lie. He also admitted that he was not controverting Ms. Pigg's sworn testimony at her Rule 2004 examination that he affirmatively advised her – in his office in the presence of her boyfriend – that she did not have to disclose the transfers.[15]

*Analysis*

---

[14]     As will be discussed below, there is no legal basis for this argument, and the Court does not believe Mr. McCrary thinks there is.

[15]     The Court notes that the UST's Motion did not allege an affirmative act of advising Ms. Pigg to lie and that the transcript from Ms. Pigg's Rule 2004 examination was not admitted into evidence. Mr. McCrary did not, however, object to the Trustee's line of questioning.

The UST's Motion seeks disgorgement of Mr. McCrary's attorney fees under § 329(b), as well as the imposition of sanctions under § 707(b)(4). Although the parties have agreed that disgorgement and a sanction of $1,500 are reasonable under the circumstances of this case, the Court has an independent duty to determine whether the disgorgement and sanctions are warranted and reasonable, as well as to determine whether other relief is appropriate.

### Section 329(b) Disgorgement

11 U.S.C. § 329(b) authorizes the Court to deny compensation to an attorney if the compensation exceeds the reasonable value of the services provided, and, to the extent excessive, order the return of the payment to the estate if the property transferred would have been property of the estate. "Because § 329 is aimed solely at preventing overreaching by a debtor's attorney . . . a court's consideration of whether to order disgorgement of fees under § 329(b) is limited to the comparison of the amount of compensation received by the attorney with the reasonable value of the services performed." *Schroeder v. Rouse (In re Redding)*, 247 B.R. 474, 478 (8th Cir. B.A.P. 2000) (citing *In re Benjamin's–Arnolds, Inc.,* No. 4-90-6127, 1997 WL 86463 (Bankr. D. Minn. 1997)). In *Redding*, the Eighth Circuit BAP held that the plain language of § 329 provides there must first be a determination that the fees are excessive, and that only after that determination, and only to the extent excessive, should there be a disgorgement. *Redding*, 247 B.R. at 478–79.

Ordinarily, the Court would have difficulty concluding that $1,300 is an excessive fee for a Chapter 7 case. Ms. Pigg did, after all, receive a discharge of more than $20,000 of unsecured debt. In this case, however, Mr. McCrary's admitted advice not to disclose the transfers caused Ms. Pigg's discharge to be delayed some four months after the original discharge deadline, and she had to endure two § 341 meetings as well as a Rule 2004 examination.[16] She did not object to

---

[16]     Mr. McCrary testified that he reimbursed Ms. Pigg's travel expenses to attend the Rule 2004 examination.

the UST's request to have the entire $1,300 disgorged to the estate, however, since that amount

will in essence be a credit against her mother's otherwise uncollectible judgment. Mr. McCrary,

in turn, admitted that $1,300 was an excessive fee. In addition, by consenting to disgorgement of

$1,300, he has waived his ability to argue that a lesser disgorgement would be appropriate under

*Redding.*

Under the circumstances of this case, the Court therefore concludes that Mr. McCrary's

fee of $1,300 is excessive within the meaning of § 329(a), and that Mr. McCrary should disgorge

$1,300 for the benefit of the bankruptcy estate.

### Mr. McCrary's Failure to Conduct a Reasonable Investigation under § 707(b)(4)

11 U.S.C. § 707(b)(4)(B) authorizes the Court to assess a civil penalty against a debtor's

attorney, payable to the Trustee or UST, if the Court, on its own motion or the motion of a party

in interest, and in accordance with Rule 9011 procedures, finds that the attorney has violated

Rule 9011. Section 707(b)(4)(C) in turn provides that the signature of an attorney on a petition

shall constitute a certification that the attorney has performed a reasonable investigation into the

circumstances that gave rise to the petition, and has determined that the petition is well grounded

in fact, warranted by existing law, and does not constitute an abuse under § 707(b)(1).  Section

707(b)(4)(D) states that "[t]he signature of an attorney on the petition shall constitute a

certification that the attorney has no knowledge after an inquiry that the information in the

schedules filed with such petition is incorrect." Courts have observed that Congress intended §

707(b)(4)(C) and (D) be read together, such that the requirement of a reasonable investigation

should apply to the information in the petition as well as the schedules and statements.[17] *See Orton v. Hoffman (In re Kayne)*, 453 B.R. 372, 381–82 (9th Cir. B.A.P. 2011).

There is no dispute that Ms. Pigg's debts were primarily consumer debts, such that § 707(b)(4) applies to Mr. McCrary. Nor is it disputed that Mr. McCrary signed Ms. Pigg's petition, certifying that he had "no knowledge after inquiry" that the information therein was incorrect when in fact the SOFA contained information he knew to be false.

The established standard for imposing sanctions is an objective determination of whether a party's conduct was reasonable under the circumstances. *See, e.g., Snyder v. Dewoskin (In re Mahendra)*, 131 F.3d 750, 759 (8th Cir. 1997) (citing *In re Armwood*, 175 B.R. 779, 788 (Bankr. N.D. Ga. 1994)).[18]

Here, Mr. McCrary admitted in his response to the UST's Motion that he violated Rule 9011 and § 707(b)(4)(D). He admitted he knew before he signed the petition that Ms. Pigg had transferred funds to her mother and sister before the bankruptcy filing. He admitted he knew that the transfers were required to be disclosed and knew that the transfers were avoidable. And he admitted that he nonetheless advised her not to disclose them. No competent lawyer – let alone an experienced bankruptcy lawyer – could objectively believe that the transfers did not have to be disclosed in at least three places in the SOFA:   Question 3.a (payments within 90 days

---

[17]     Mr. McCrary in his response to the UST's Motion admitted that § 707(b)(4)(D) applies to the schedules and SOFA, and he therefore has waived any argument that he should not be sanctioned under § 707(b)(4)(D) for false information that appeared only in the SOFA, and not the schedules.

[18]     *Mahendra* applied Rule 9011 before it was amended effective December 1, 1997. With respect to a factual investigation, the prior version of Rule 9011 required simply that the petition be "well grounded in fact." The current version of Rule 9011 arguably imposes a lower bar for the factual investigation: that the "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Interestingly, § 707(b)(4)(C) incorporates the old "well grounded in fact" and other language from the previous version of Rule 9011. The difference in the language used in § 707(b)(4)(C) and the current version of Rule 9011 does not alter the result in this case, however, since under either the "well-grounded-in-fact" or "evidentiary-support" standards, Mr. McCrary's factual investigation falls short.

aggregating more than $600[19]), Question 3.c (payments to or for the benefit of insiders[20]) and Question 10.a (transfers outside the ordinary course of business[21]).

Nor could any lawyer objectively believe that "disguised rent" for the benefit of Ms. Pigg's mother did not have to be disclosed under both Questions 3.a and 3.c. The Court in fact does not believe that Mr. McCrary believed the $3,654.53 payment to Ms. Pigg's mother – apparently earmarked for her creditor, the Putnam County State Bank –  was "disguised rent," since Mr. McCrary had (appropriately) scheduled another landlord as a creditor for Ms. Pigg on the Schedule G.

Under the objective standard of Rule 9011, the Court concludes Mr. McCrary violated § 707(b)(4)(D), and that sanctions payable to the Trustee for the benefit of the *Pigg* estate are warranted for his violation.  The Court further concludes that $1,500 is a reasonable civil penalty based on Mr. McCrary's admission that $1,500 is reasonable, and based on the Court's review of the Trustee's time spent in the case. *See In re Kayne*, 453 B.R. 372 (9th Cir. B.A.P. 2011) ($20,000 sanction in amount of the trustee's attorney fees affirmed for § 707(b)(4)(D) violation; debtor's attorney knowingly failed to schedule a valuable note as an asset); *LaFayette v. Collins (In re Withrow)*, 405 B.R. 505 (1st Cir. B.A.P. 2009) ($3,585 sanction for § 707(b)(4)(D) and Rule 9011 violations affirmed).

---

[19]    SOFA Question 3.a requires a debtor to list all "payments on loans, installment purchases of goods or services, and any other debts to any creditor made within **90 days** immediately preceding the commencement of the case" in excess in the aggregate of $600.

[20]    SOFA Question 3.c requires a debtor to list "all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders." Ms. Pigg's mother and sister are unequivocally "insiders." 11 U.S.C. § 101(31)(A)(i).

[21]    SOFA Question 10.a requires a debtor to list "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of the case." It is not ordinary course for a debtor to use tax refunds to pay back family members. *See Cox v. Momar Inc. (In re Affiliated Foods, Southwest Inc.)*, 750 F.3d 714, 719 (8th Cir. 2014) (the ordinary course defense requires the creditor to show consistency with other business transactions between the two parties); *see also Schlant v. Bartolucci (In re Gawronski)*, 411 B.R. 139, 142 (Bankr. W.D.N.Y. 2009) ("[T]he mere existence of a family relationship will not establish an ordinary course. Quite to the contrary, family relationships may even suggest motivations for a loan outside the ordinary course . . . .").

*Harkins Case*

*Findings of Fact*

*Ms. Harkins' Bankruptcy Filing*

Mr. McCrary filed a Chapter 7 bankruptcy for Jessica Harkins on August 15, 2014. The petition contains the same § 707(b)(4)(D) and RRA certifications as the *Pigg* petition. The Rule 2016(b) disclosures and the SOFA revealed that Ms. Harkins paid Mr. McCrary a $1,250 attorney fee in June 2014. Ms. Harkins' Schedule A reflected that she owned a residence in Trenton, Missouri, valued at $69,900, and encumbered by a deed of trust in the amount of $61,142. The property was described as a "3 bedroom home, unfinished basement purchased in 2010 for $69,900. House was unoccupied between July 2012, and February 2013, and vandalized."

The Schedule B disclosed that Ms. Harkins had $15 cash on hand and $450 in a bank account, along with minimal other personal property. Her Schedule J of expenses reflected a monthly mortgage payment of $419, and no expenses for home maintenance or repairs. In response to SOFA Question 8, Losses, Ms. Harkins listed:

DESCRIPTION AND VALUE OF PROPERTY
**Hail damage to residence.  $9,121.46**

DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY
INSURANCE, GIVE PARTICULARS
**storm damage was covered by insurance - $1,200
deductible left Debtor with a balance of $7,921.46 to repair the damage with.**

DATE OF LOSS
**May 2014**

Bruce E. Strauss (the same Trustee as in the *Pigg* case) was duly appointed as Chapter 7 Trustee. The SOFA disclosure about the hail damage appears calculated to convince the Trustee that the repairs had already been made, particularly since the Schedule B did not reflect cash or account balances of anywhere close to this amount. The Trustee, in fact, reviewed the SOFA the

14

day the case was filed and emailed Mr. McCrary requesting he provide within 14 days a complete and full accounting for the insurance proceeds from the hail damage, including copies of paid statements. Mr. McCrary did not respond to this request.

In reality, however, about two months before she filed bankruptcy, Ms. Harkins deposited $8,021.14 of the insurance proceeds into her checking account,[22] and then shortly thereafter withdrew $5,000 in cash. The evidence is unclear about what Ms. Harkins intended to do with the cash, as will be discussed in more detail below. In any event, Ms. Harkins put the cash in a lockbox in a safe at her employer's office sometime after she withdrew the cash in late June 2014.

As noted above, Ms. Harkins had already paid Mr. McCrary's attorney fee sometime in June 2014. But she did not meet with Mr. McCrary to finalize and sign her bankruptcy petition, schedules, and statements until later, on August 1, 2014. The evidence is uncontroverted that Ms. Harkins disclosed the $5,000 in cash to Mr. McCrary at that time, and that they discussed it. In the schedules that Mr. McCrary prepared and Ms. Harkins signed on August 1, 2014, however, the existence of the $5,000 cash in a lockbox in a safe was not revealed.

Mr. McCrary filed Ms. Harkins' bankruptcy case two weeks later, or on August 15, 2015. He did not talk to Ms. Harkins again before he filed her case.[23] The petition filed with the Court,

---

[22] Ms. Harkins did not keep a copy of the check, according to her testimony at the § 341 meeting. It is not clear from the evidence why there is a discrepancy between the $8,021.14 Ms. Harkins deposited, and the $7,921.46 that the SOFA discloses she received.

[23] The Court is frankly shocked that any bankruptcy lawyer would have the client sign schedules and statements two weeks before filing them without talking to the client in the interim to ensure that nothing had changed. Many things change in two weeks. Assets may be acquired or transferred, for example. Bank account balances, as required to be disclosed on the Schedule B, fluctuate daily; payments to creditors within the 90 days before the filing on SOFA Question 3.a may also change as the 90-day period shifts. Income earned year-to-date per SOFA Question 1.a changes with the receipt of every paycheck; current monthly income in the six months before the filing as per the "means test" forms also may change. In addition, a debtor is required to file paystubs for the 60 day period preceding the bankruptcy (11 U.S.C. § 521(a)(1)(B)(iv)), and the failure to file *all* required paystubs may result in dismissal. *See* 11 U.S.C. § 521(i)(1) (providing for automatic dismissal on the 46th day for the debtor's failure "to file all of the information required" under § 521(a)(1). *E.g. In re Calhoun*, 359 B.R. 738 (Bankr. E.D. Mo. 2007). *But see Community Bank, N.A. v. Riffle*, 617 F.3d 171 (2nd Cir. 2010); *In re Warren*, 568 F.3d 1113 (9th

however, bears an incorrect signing date of August 15, 2015.[24] Whether Mr. McCrary filed a petition with an incorrect signing date is, however, not an issue in this case. The fact that is important is that sometime around August 15, Ms. Harkins began spending down the cash. By the date of the § 341 meeting about six weeks later, most of the cash was gone.

**The First § 341 Meeting**

At the first § 341 meeting, Ms. Harkins appeared along with Mr. McCrary. The Trustee asked her if she had listed all her assets and liabilities and whether any changes were necessary "to keep them accurate." Ms. Harkins answered that she had listed all assets and liabilities and no changes were necessary.  Mr. McCrary did not correct Ms. Harkins' false testimony. The Trustee then asked Ms. Harkins to identify a deposit of $8,021.14 he had noticed in Ms. Harkins' bank statements[25] provided at his request by Mr. McCrary before the § 341 meeting. Ms. Harkins responded: "Insurance claim on a hail damage." Mr. McCrary jumped in and the following colloquy ensued:

**Mr. McCrary:**      And she lists that on the [Trustee's] questionnaire.[26]

**Q [By the Trustee]:**  And insurance on damage to what?

**A [By Ms. Harkins]:** My home.

**Q:**      Are you still in the home?

**A:**      Yes, sir.

**Q:**      Didn't you vacate it for a while?

---

Cir. 2009);; *In re Acosta-Rivera*, 557 F.3d 8 (1st Cir. 2009) (automatic dismissal excused or avoided under certain circumstances).

[24]      This is a troubling misrepresentation as will soon be made clear.

[25]      The Trustee testified that not all trustees request several months of bank statements. Had the Trustee not done so in this case, he would never have discovered this deposit unless Ms. Harkins or Mr. McCrary voluntarily disclosed it. The implication is that Mr. McCrary was apparently relying on the Trustee not requesting bank statements for other than the month of the filing, as the Trustee argued in his closing argument.

[26]      Mr. Strauss sends debtors and their counsel a questionnaire in advance of the meeting of creditors, requesting additional information and documents and requesting the questionnaire be returned. The Trustee stated at the hearing that he did not receive Ms. Harkins' questionnaire before the § 341 meeting.

**A:**      No.

**Q:**      You never vacated the property?

**A:**      No.[27]

**Q:**      [D]id you make the repairs to the home?

**A:**      No. I'm in line.

**Q:**      Excuse me?

**A:**      I'm in line.

**Q:**      Okay. Why am I not seeing the payment out to Mr. McCrary? Am I missing it here?

**A:**      Yeah. It was out of my checking account. So, it should be –

**Q:**      Yeah. It was in June it says.

**Mr. McCrary:**      I think it [was] in June.

**A [By Ms. Harkins]:** I wrote a check.

**Q:**      You also cashed a check for $5,000. What did you do with that five –

**A:**      It's in a safe.

**Q:**      Excuse me?

**A:**      It's in a safe.  And that's my, that's for the insurance.

After this exchange with Ms. Harkins, Mr. McCrary jumped in again, stating that Ms. Harkins had withdrawn the insurance proceeds out of her account, but when the contractor wasn't ready, she had not redeposited the money, adding, "[b]ut that's still insurance proceeds and she [has] kept it segregated." A lengthy discussion between the Trustee and Mr. McCrary

---

[27]      Ms. Harkins later admitted that she had indeed vacated the home for a period of time. This exchange shows, however, how unsophisticated debtors may become confused and why it is so important that the attorney conduct the reasonable investigation the Code requires.

followed, with the Trustee increasingly becoming frustrated by Mr. McCrary's inability to directly answer the question why the cash was not scheduled:

| | |
|---|---|
| **Trustee:** | Well, where is it scheduled? |
| **Mr. McCrary:** | I don't know if I have it scheduled but that's not – |
| **Trustee:** | No. That's my question. I wasn't, that was my question, Michael. |
| **Mr. McCrary:** | Okay. |
| **Trustee:** | Where is it scheduled? |
| **Mr. McCrary:** | I, I may not have it scheduled. |
| **Trustee:** | Were you aware of it? |
| **Mr. McCrary:** | Yes. We talked about it. |
| **Trustee:** | So why isn't it scheduled? |
| **Mr. McCrary:** | But that's, that's loss pay money. That's – |
| **Trustee:** | Michael – |
| **Mr. McCrary:** | – either insurance money – |
| **Trustee:** | So, is, are you telling me that – |
| **Mr. McCrary:** | – that she – |
| **Trustee:** | – then you don't have to identify it? |
| **Mr. McCrary:** | No. I, I think is should be on – |
| **Trustee:** | Then answer my question. |
| **Mr. McCrary:** | Okay. |
| **Trustee:** | Why isn't it in the schedules? |
| **Mr. McCrary:** | She and I did talk about it at signing. I did not – |
| **Trustee:** | I know, I know it's not in, you keep repeating yourself. |

| **Mr. McCrary:** | Yeah. |
| **Trustee:** | I know it's not in the schedules. What I'm asking you is why isn't it in the schedules? |
| **Mr. McCrary:** | Other than an oversight on my part, I don't have an answer. |

Mr. McCrary in fact never answered the Trustee's question directly about why the cash was not scheduled. The meeting then ended with the Trustee demanding that the funds be turned over and the schedules amended immediately, and the meeting was continued to November 7, 2014.

### *Events Following the First Harkins § 341 Meeting*

Later on the morning of the § 341 meeting, the Trustee faxed a letter to Ms. Harkins' employer, requesting the employer secure the $5,000 and not allow anyone access to the money without his express permission. Since the employer was several hours away, the Trustee arranged for a lawyer he knew to retrieve the lockbox from the safe at the employer's office, and asked Mr. McCrary to obtain the key.

In the meantime, Mr. McCrary emailed the Trustee a few days later, asking "what form" the Trustee preferred to receive the insurance proceeds in. Apart from being an inane question (the Trustee had already said Ms. Harkins was not to touch the cash in the box in the safe), the Trustee understandably did not answer Mr. McCrary's email, believing that the funds were secured and on their way to the Trustee's office. Unbeknownst to the Trustee, however, Ms. Harkins had already[28] cleaned out what she later represented was the remaining cash, a fact Mr. McCrary conveniently omitted from his email to the Trustee.[29]

---

[28]     As will be discussed below, it is unclear whether any cash remained in the lockbox as of the date of the § 341 meeting, or whether Ms. Harkins removed the rest of it afterwards, contrary to the Trustee's instructions.

[29]     The Court can only assume that Mr. McCrary knew his client had retrieved the cash from the box, contrary to the Trustee's instructions; otherwise, why would he ask such a question?

Three weeks after the § 341 meeting, Mr. McCrary emailed the Trustee. The email states:

Mr. Trustee:

My client called me today in response to your phone call of either yesterday or today to her employer.

My client has stated to me that she has sent you all of the cash that she still had as of the date of her meeting of creditors, October 3rd. She told me that several days ago she mailed to you either $1,500 or $1,600. That amount is less than what was in her possession on the date of filing, August 15th. The debtor did spend a portion of the cash in the time period between the date of filing and date of [the] meeting of creditors.

My client has told me that there is no more remaining cash in her possession or control or in her employer's keeping, and that, once again, she has sent you all of what remained at the time of her meeting of creditors.

The Trustee responded by email a few minutes later, pointing out that that was inconsistent with Ms. Harkins' testimony at the § 341 meeting. The Trustee stated that he had received some funds in the mail, apparently from Ms. Harkins, but was not sure of the source, and again reminded Mr. McCrary that his client was not to take control of the lockbox. With respect to Mr. McCrary's actions, the Trustee said: "I do consider the failure to identify the funds [,] which both you and she were aware of, as a serious breach of bankruptcy law [and] which I would have never discovered but for the earlier bank statement reflecting the initial deposit and withdrawal of funds." In his emailed response several minutes later, Mr. McCrary did not deny that he had known about the existence of the cash, but said: "Once again, the Debtor has turned over all of the cash that remained on the date of the meeting of creditors. There is no cash left to be collected." The Trustee replied by again stating he was taking control of the lockbox, and demanding that Ms. Harkins provide a full accounting of the alleged use of the funds, including dates of usage.

***Testimony at the Second Harkins § 341 Meeting***

20

At the continued § 341 meeting weeks later, confusion about the amount of cash and what happened to the cash continued to reign.

The Trustee opened the lockbox with the key provided by Mr. McCrary, only to find that the box was empty. Further discussion about the box ensued. Ms. Harkins insisted at one point that she had $5,000 in cash in the box on the filing date, and that she spent only $2,600 after filing and before the first § 341 meeting, but then contradicted her testimony by saying she had actually spent $3,500.

Once it appeared to be settled that she had spent $3,500, not $2,600; that the $1,500 she had sent to the Trustee was supposedly the $1,500 remaining from the original $5,000; and that she was willing to provide an accounting, the Trustee turned to, as he put it, getting "a better understanding quite honestly of who's responsible here." The record reflects that Mr. McCrary responded, saying "Mm-hmm."

The next series of exchanges is particularly troubling to the Court:

**Q [By the Trustee]:**   McCrary indicated in here that yes he was aware of the money and you guys discussed it. And when I asked well why isn't it listed, Mr. McCrary said, "other than an oversight on my part, I don't have an answer." Are you telling me, Michael, that this was an oversight?

**Mr. McCrary**: At the time, at the time of signing on August 1st, we discussed the money. It was my understanding and it was our discussion that in the next two weeks, the first two weeks of August, that she was going to get the repairs done. Does that sound right to you?

**A [By Ms. Harkins]:** That was what you said to me after we got out of the meeting.

**Mr. McCrary:** Okay. Okay.

**A [By Ms. Harkins]:** But we never had that conversation.

**Q [By the Trustee]:** What do you mean you never had that conversation?

**A:**    I, I didn't tell him that I had appointments made for these repairs to be made. I didn't have a time frame.

**Q [By the Trustee]:**  So, now you've lost me again. Did you have a conversation – and you know what, you can certainly, if you, you know, I'm not … your attorney… –

**A:**    I'm ready to clear this up. I'm –

**Q:**    The problem is, we –

**A:**    –- an anxiety attack.

…

**Q:**    … You're not without fault, ma'am, because you clearly led me to believe that there was money in there and there wasn't.

**A:**    And you want to know why I did that?

**Q:**    Yeah.

**A:**    Because my attorney said the money was in there. You were speaking with him and he said yes. And so I said yes.[30]

This exchange continued with Ms. Harkins admitting that she could have corrected Mr. McCrary but did not, and admitting that she had not told Mr. McCrary that she was spending the money prior to the first § 341 meeting.

---

[30]    Ms. Harkins' recollection of the testimony at the first § 341 meeting is not correct. She was the one who in fact first mentioned that the money was in a safe. Mr. McCrary's interjection – that she had kept the money "segregated" – was also not untruthful to the extent one would consider money in a safe to be "segregated." Mr. McCrary's interjections and statements did assist Ms. Harkins, however, in misleading the Trustee to believe that there was $5,000 in cash still in a lockbox in a safe as of the date Ms. Harkins filed her bankruptcy. And, this still does not explain why, if Mr. McCrary knew there was cash in a safe,  he did not disclose it in the schedules.

Then the Trustee continued: "Let's say the conversation took place and she was going to have the repairs made in two weeks, that's not what you put on the schedules nonetheless." Mr. McCrary responded: "I did not follow up prior to filing." Ms. Harkins then interjected: "Not only did he not follow up, he did not return my phone calls. He called me yesterday evening. At 4:10, his secretary called me to ask for this, this piece of paper [the accounting]. So, I had to scramble."

The Trustee responded: "Let me ask you this. When is the first time you learned that I wanted the next bank account record plus an accounting of what was done with the money? Was it yesterday?" Ms. Harkins replied:

> On the 23rd, I believe I received from Mr. McCrary and then I returned the call to Mr. McCrary and I didn't get called back. . . . And then when I did finally get to speak with Mr. McCrary, it was 10 after four yesterday evening. I feel like I'm getting thrown under the bus, I am not a liar. I'm not good at [it] because I can't remember how to lie. So, I want to fix it. What, what can we do today to fix it?

The Trustee then returned to the issue of when Ms. Harkins had learned she needed to supply an accounting. Mr. McCrary responded in a way that suggested he believed he did not need to talk to his client since the Trustee's email contained a "cc client" at the bottom. When the Trustee responded that he was not communicating with Ms. Harkins directly, Mr. McCrary admitted he had not talked to Ms. Harkins until the evening before the meeting. Ms. Harkins said that she had written down the dates and times she had called to try to talk to Mr. McCrary: "I understand he's a busy man[,]  however, I'm having anxiety attacks over this mess that I am in. . . . I want to fix it. And I want to fix it today."

The discussion finally turned to what it would take to "fix it." Mr. McCrary said he intended to file an amended Schedule C to claim an unused exemption in the cash; the Trustee pointed out that he would object to the exemption in recovered funds (under § 524(g)), and that

23

Ms. Harkins needed to pay back $5,000,[31] and that the UST was investigating denial of discharge for false oath. Mr. McCrary then interjected: "The only thing that she was not truthful about when we were here last month was access to the box because she didn't want to involve her employer. . . . But she told you that there was $1,500, $1,600 in there at that time . . . " As the Trustee was denying Mr. McCrary's recollection, Ms. Harkins corrected Mr. McCrary, saying "$5,000."

### Events After the Second § 341 Meeting

It was not until late November – some 3 months after the filing – that Mr. McCrary filed amended schedules. And, rather than disclosing the $5,000 cash Ms. Harkins had testified she had as of the date of filing, the Amended Schedule B disclosed "$1,500, insurance money from storm damage to home" in response to Question 18, "Other liquidated debts owed to debtor including tax refunds."[32] Since Ms. Harkins had already testified she had cash on hand at the time of filing, and since Mr. McCrary had stated that he knew Ms. Harkins had cash on hand, the Court does not understand why Mr. McCrary did not schedule the $5,000 cash in response to Question 1 on Schedule B requesting the scheduling of "Cash on hand." In the meantime, however, the deadline to object to Ms. Harkins' discharge expired on December 2, 2014 without any party objecting; she has not yet received a discharge since she has not completed her financial management course and filed the certificate of completion.[33]

---

[31]     The Trustee later demanded $3,500, given that he had already received $1,500 from either Ms. Harkins or Mr. McCrary.

[32]     The amended Schedule B still listed $15 in cash on hand at the time of filing.

[33]     It is hard to believe that Ms. Harkins would knowingly jeopardize her ability to get a discharge by failing to take this mandatory counseling, given her testimony at the continued § 341 meeting about her anxiety in getting the matter "fixed" so her bankruptcy "could go through." A debtor's lawyer has the duty to advise the client about the necessity of completing the financial management course, for which the charge is nominal (in many cases, less than $20). There was no evidence about whether the failure of Ms. Harkins to complete the financial management course is the fault of Ms. Harkins or Mr. McCrary. However, the Court's Notice of December 8, 2014 directed that Ms. Harkins had 30 days to file the certificate and warned her that, otherwise, the case could be closed and she would have to pay a filing fee ($230) to reopen the case. That Notice was served on Mr. McCrary by ECF notice, and he

### The UST's Motion for Disgorgement & Sanctions

In March 2015, the UST filed a motion against Mr. McCrary for disgorgement and sanctions. The UST alleged that disgorgement of Mr. McCrary's fees was justified under § 329(b) for Mr. McCrary's failure to properly advise Ms. Harkins about the $5,000; his failure to disclose the $5,000 cash as an asset; his failure to amend the schedules immediately after the § 341 meeting to disclose the $5,000; and his failure to assist the Trustee in discovering what happened to the $5,000. The UST also sought sanctions under § 707(b)(4), on the grounds that, having knowledge of the $5,000 cash,  Mr. McCrary should have made a reasonable inquiry into the disposition of the funds and scheduled the cash as an asset. The UST suggested that an appropriate sanction to compensate the estate would be $1,000.

### Mr. McCrary' Response to the Motion

Mr. McCrary filed a timely response to the UST's Motion. He admitted that Ms. Harkins had $5,000 in a safe on August 15, 2014, the day she filed bankruptcy, that he had talked to her about the $5,000, and that the $5,000 had not been disclosed. But he denied the allegation that he did not advise her that the $5,000 was property of the estate and that she should not spend the money. Mr. McCrary also denied that disgorgement of his fee was appropriate, affirmatively stating that his law firm had already disgorged $650 to the estate and $600 directly to Ms. Harkins.

---

had a duty to in turn provide notice to his client. In this Court's experience, most lawyers file motions to extend the time to file the certificate to ensure their client is not penalized by a closing of the case without the certificate. There was no evidence about whether Mr. McCrary provided the notice to Ms. Harkins or not. However, an administrative closing of the case by the clerk does not "dismiss" the case or let a debtor's attorney "off the hook" for his responsibilities; it means the unfortunate debtor does not receive a discharge. And, again, although there is no evidence in the record regarding whether Ms. Harkins has taken the financial management course or not, the Court notes it would be a conflict of interest for a lawyer not to file the certificate of completion of the financial management course when it is in the client's best interest to do so in order to obtain the client's discharge. The RRA also requires that the attorney advise his client "of the requirement to complete an instructional course in personal financial management, and the consequences of not doing so."

Mr. McCrary also denied that he had failed to conduct a reasonable investigation into the $5,000 and denied he had violated § 707(b)(4)(D), among other denials. He affirmatively stated that he did not contest the Court's jurisdiction, but said he "has been dismissed by Debtor so [he] believes that he cannot speak for Debtor as to this issue." Mr. McCrary did, however, admit that, "[i]n the interests of efficiency. . ." a $1,000 monetary sanction was appropriate.

The Court notes that Mr. McCrary had (and has) not filed a motion to withdraw as counsel of record for Ms. Harkins. [34]

***The Court's Hearing in Harkins***

In any event, upon the filing of Mr. McCrary's response to the UST's Motion, the Court set a hearing on the Court's regular docket. The day before the hearing, Mr. McCrary called the Court's Courtroom Deputy and inquired whether he was required to appear. The Courtroom Deputy advised Mr. McCrary, the UST and the Trustee after consultation with this Judge that Mr. McCrary needed to appear and that the hearing would go forward.

At 8:34 a.m. the morning of the hearing, Mr. McCrary filed a "Motion to Rule on the Pleadings, or in the Alternative, Motion for Continuance." The Motion stated that Mr. McCrary "has responded to the pending motion from the [UST and] has consented to all relief sought in the pending motion" and that he "is unable to confirm or ascertain [Ms. Harkins'] position or consent as to the Court's jurisdiction to enter a final order. However, several weeks ago, the undersigned asked [Ms. Harkins] to contact the panel trustee in order to communicate such consent."

---

[34]    MRPC 4-1.16(a)(3) requires a lawyer to terminate the representation when the lawyer has been discharged, but any termination must comply with the rules of the tribunal. MRPC 4-1.16(c). L.R. 2091-1 states that an attorney may only withdraw after entry of a court order upon notice to the client and other interested parties, including a trustee and the UST.

As Mr. McCrary knows, the Court conducts hearings (docket calls) in the St. Joseph Division cases once a month, in the Buchanan County Courthouse, starting at 9:30 a.m. This Judge was already traveling to St. Joseph when Mr. McCrary filed his motion. And since this Judge uses a state court courtroom, this Judge does not have access to the Western District's computers but instead can only connect to ECF through an iPad.

The Trustee and Counsel for the UST (who likewise had traveled to get to the hearing) had been waiting approximately 30 minutes when the Court called the UST's Motion in the *Harkins* case. Mr. McCrary not only failed to appear at the hearing, but had not contacted either of his opposing counsel, nor had he contacted the Courtroom Deputy to inform her he was not going to appear. It was only by luck that the Courtroom Deputy noted the late-filed motion in time to tell the Court that it had been filed, such that, when the Court called the UST's Motion, the Court could announce that a continuance motion had been filed.

The Court denied Mr. McCrary's motion on the grounds it was untimely filed and noncompliant with the local rule on continuance motions, also noting that the Courtroom Deputy advised Mr. McCrary of his required attendance. The Court also denied the motion for "judgment on the pleadings" on the merits, given that Mr. McCrary had not, in fact, consented to all the relief requested in the UST's Motion. The Court questioned how Mr. McCrary could seemingly abandon his client by directing her to contact the Trustee directly when he was still counsel of record. The Court also noted that it was unclear whether Mr. McCrary had notified Ms. Harkins of the hearing, as required under the RRA. The Court stated that a written order to show cause why further sanctions should not be imposed would issue.

**The Court's OSC in Harkins**

As a result of Mr. McCrary's failure to appear, failure to comply with local rules, and filing of a facially frivolous motion, the Court issued its own OSC. The OSC provides in pertinent part:

> Although Mr. McCrary states that "he consents to all relief" in the U.S. Trustee's Motion to Compel, Mr. McCrary overlooks the fact that: (1) the Court has an independent duty to investigate such a serious allegation of legal and ethical misconduct to determine what sanctions, monetary and otherwise, including a referral to the Disciplinary Administrator and the Western District of Missouri Court en banc,  should be imposed.; (2) Mr. McCrary did not in fact consent to the U.S. Trustee's relief;  his response to the Motion to compel denies, rather than admits, any wrongdoing or sanctions, despite nonetheless "offering" to disgorge his fees and pay a penalty; (3) Mr. McCrary, although stating in his response and the motion to continue that he no longer represents the Debtor, has not sought leave to withdraw and thus is still counsel of record and required under the Rights and Responsibilities Agreement to attend all hearings on his client's behalf; and (4)  there is no indication that Mr. McCrary served his client, the Debtor, with Notice of Hearing, such that the Court could determine whether and how the Debtor's interests will be protected in connection with the Motion to Compel.

After making these and other findings in the order, the Court issued an order to Mr. McCrary to show why, in addition to the relief requested by the UST, he should not be sanctioned on the Court's own motion for his failure to appear at the hearing, his filing of an untimely and meritless motion, and his apparent abandonment of his client without seeking leave of court to withdraw. The Court also ordered Mr. McCrary to show cause why sanctions payable to the Trustee and UST's counsel to reimburse them for their wasted time at the hearing should not be imposed. The Court's OSC set a deadline for Mr. McCrary to respond, and consolidated the hearing on the Court's OSC with the pretrial and final evidentiary hearings already scheduled on the UST's *Pigg* and *Harkins* Motions.

### *The UST's Amended Motion for Sanctions & the Court's Second OSC in Harkins; Mr. McCrary's Failure to Respond*

Shortly thereafter, the UST filed an amended motion for sanctions against Mr. McCrary, raising new allegations of misconduct. The UST alleged that the Trustee had advised Mr.

McCrary that Ms. Harkins had an unused exemption that would allow her to keep a portion of her tax refund, but that Mr. McCrary had failed to file an amended Schedule C to claim it. In addition, the UST alleged that Mr. McCrary had misrepresented his acquiescence to the $1,000 sanction; although telling the Court in the response he was willing "[i]n the interests of efficiency" to pay it, he had advised the Trustee in writing that he would not pay the sanction without a court order. Finally, the UST also recited Mr. McCrary's failure to appear at the hearing. Based on these additional allegations, the UST sought disgorgement of his attorney fees in addition to an increased sanction in the amount of triple his attorney fees, or $3,750.

Mr. McCrary did not respond to the UST's amended motion for sanctions, and did not respond to the Court's OSC. In order to provide Mr. McCrary another due process opportunity to respond to the Court's OSC, the Court issued another OSC.  Referring to Mr. McCrary's failure to respond to the Court's earlier OSC, this new OSC directed Mr. McCrary to be prepared to address at the next hearing his failure to respond to the Court's first OSC, and whether additional sanctions should be imposed for such failure. The Court's Order also explicitly directed Mr. McCrary to file a response to the OSC.

*No Response by Mr. McCrary to the Second OSC; the Pretrial Hearing in Harkins*

Mr. McCrary did not respond to the Court's second OSC, but appeared for the pretrial phone conference. Mr. McCrary stated he was disputing the UST's allegations in its motion and amended motion. The Court thus set a deadline for the parties to file witness and exhibit lists before the final evidentiary hearing. The Court emphasized that the UST's and Trustee's exhibits should include their itemized fee and expense statements so that Mr. McCrary would have the opportunity to review and dispute the statements before the hearing. Both the UST and the Trustee timely filed their witness and exhibits lists, including their respective itemized fee and

expense statements. Mr. McCrary did not submit any other witnesses or exhibits other than those already listed by the UST and the Trustee.

In the meantime, the day after the pretrial conference and about a week before the final hearing on the sanctions motions, Mr. McCrary finally filed amended schedules B and C to claim Ms. Harkins' exemption in her 2014 tax refunds, and also filed a motion to shorten the time for the Trustee to object to the amendment to seven days. The Trustee objected to the request for shortened time. The Trustee noted that the proposed deadline would expire over the Fourth of July holiday and that he was out of the office. He also pointed out that shortening the time to object was not appropriate, given that Mr. McCrary had delayed months in filing the amendment.

The Court sustained the Trustee's objection to the motion to shorten, noting that Mr. McCrary had failed to state cause to shorten and that the Trustee would be prejudiced by the time being shortened. The normal 30-day period for objecting to amended exemptions ultimately passed without objection.

### The Harkins Evidentiary Hearing

The *Harkins* hearing immediately followed the hearing in *Pigg*. The Trustee testified to the facts the Court has already recited. He stated that he had recovered $2,150 of the missing $5,000, comprised of two checks for $750 from Ms. Harkins and a check for $650 from Mr. McCrary. It was not clear to the Trustee whether Ms. Harkins' checks came from funds in the lockbox or whether Mr. McCrary had supplied some of the funds to Ms. Harkins to make the payment.

Mr. McCrary called himself to the stand and was sworn in as his only witness. He exhibited the same nervous, inarticulate, and fumbling behavior the Court observed during the *Pigg* hearing. He testified that he had refunded the $650 and paid it to the Trustee to help Ms.

Harkins. He testified that he had instructed her to get the repairs done after the signing but before the filing, and expressed that he "wished he had called the client" before the filing. He gave no explanation for why Ms. Harkins had testified that he had not instructed her to spend the money before the filing. He gave no explanation for why, if he thought she was spending $5,000 in cash before the filing, he did not think to check with her again before he filed the bankruptcy case. He gave no explanation for why, if he thought she was spending down the money, he did not tell her to keep receipts. He gave no explanation for how he could have reasonably believed that spending down $5,000 was "ordinary course" spending such that it would not have been required to be disclosed.

Mr. McCrary also did not explain why he allowed Ms. Harkins to testify falsely at the § 341 meeting that her schedules and statements were correct. He did not explain why, after learning that Ms. Harkins was continuing to spend the cash that was property of the estate, he did not immediately advise her to (1) stop spending the cash; (2) not remove the remaining cash from the lockbox; (3) prepare an accounting of what she had spent; and (4) file an amendment to correct the false schedules. He did not explain why, if he thought the cash was exempt as insurance proceeds, he did not schedule the cash on the Schedule B in the first instance and claim it exempt on Schedule C, or why, in the belated amended Schedule B he did file,  he still failed to accurately disclose the $5,000 cash on hand on the date of filing. Rather, Mr. McCrary insisted to the Court that his actions in *Harkins* were somehow different from those in *Pigg,* but did not explain how or why; he also expressed his "shame and fear" about the *Harkins* matter, and admitted the case had been prolonged due to his "avoidance and shame."

As in the *Pigg* case, Mr. McCrary's explanation for his actions in the *Harkins* case is simply not credible. The Court does not believe Mr. McCrary's excuse that he thought Ms.

Harkins had spent the money before filing and that he simply "forgot" to follow up with her before he filed the case. If that story were true, Mr. McCrary had numerous opportunities at both § 341 meetings to say so in response to the Trustee's repeated questions about his failure to schedule the cash, and to follow up by immediately filing amended schedules.

The Court likewise does not believe the first theory Mr. McCrary advanced at the § 341 meeting – that the cash was exempt homestead insurance proceeds that did not have to be scheduled. Mr. McCrary cited no case authority for that proposition, and this Court finds none. Moreover, his explanation is likewise belied by the email requests that the Trustee sent to Mr. McCrary on Day 1 of the case, as well as Mr. McCrary's responses, and the fact that he never attempted to claim an exemption in the cash. The fact the Trustee emailed Mr. McCrary about the insurance proceeds the day the case was filed also proves that the failure to schedule the proceeds was not a mere oversight, as Mr. McCrary alternatively suggested to the Trustee (but did not argue to the Court). The Court instead believes Ms. Harkins' credible testimony[35] – that Mr. McCrary never told her to spend the money before she filed, and that he only told her to say that after the first § 341 meeting in an attempt to cover up his improper behavior.

In sum, there is no credible evidence to support Mr. McCrary's defense that he merely failed to follow up with his client. Rather, the Court believes the evidence overwhelmingly supports the UST's allegations: that Mr. McCrary knowingly advised Ms. Harkins to sign false schedules under penalty of perjury and to testify falsely because it was more expedient for his purposes – to be able to earn a quick fee for Ms. Harkins' "simple case" – and that no one, including the Trustee, would be any the wiser if Ms. Harkins spent the money later. And again, although Mr. McCrary professed he was ashamed, the Court's close observations of Mr.

---

[35] Ms. Harkins can be faulted for implying, in her initial § 341 testimony, that the $5,000 was still in the safe. But, on balance, the rest of her testimony was forthcoming, particularly as compared to Mr. McCrary's contradictory explanations.

McCrary's insincere demeanor and contradictory explanations compel the Court to believe Mr. McCrary was only ashamed because he was caught.

### Harkins Conclusions of Law

Mr. McCrary did not file a response to the UST's amended motion for sanctions, and is deemed to have admitted the allegations. In addition, he stated at the hearing that he agreed to disgorgement and payment of a penalty in the amount of $3,750, albeit while denying that he did anything wrong other than wishing he had called Ms. Harkins before he filed her bankruptcy case. The Court thus needs to examine the evidence to see if disgorgement and sanctions are warranted.

### Disgorgement Under § 329(b)

As discussed above, § 329(b) of the Bankruptcy Code authorizes the Court to deny or disgorge compensation to the extent the compensation exceeds the reasonable value of the services provided. The Court agrees with the UST that Mr. McCrary's many failures to properly advise Ms. Harkins, to file accurate schedules, and to promptly amend schedules needlessly prolonged Ms. Harkins' case and caused her, in her words, "anxiety attacks." Mr. McCrary offered no reasonable or credible defense to these admitted failures. Ms. Harkins has not received a discharge of her debts. And, Mr. McCrary had not filed motions to avoid judgment liens against Ms. Harkins' property until after the Court questioned why he had not done so.[36]

The Court concludes that, by failing to respond to the UST's Amended Motion and by agreeing to the disgorgement, Mr. McCrary has waived any argument that a lesser disgorgement

---

[36] In preparing for the hearing, the Court noted that Ms. Harkins had two state court judgments filed against her but no equity in her home, and that she intended to keep her home and to reaffirm the debt. A failure to utilize the simple mechanism of clearing the judgment liens under § 522(f) would have meant the judgment liens would continue to encumber her property and would have impaired her fresh start. *See generally Farrey v. Sanderfoot,* 500 U.S. 291, 297 (1991). In addition, the RRA requires a lawyer to file lien avoidance motions as part of the flat fee charged for the bankruptcy.

would be appropriate under *Redding*.[37] The Court further concludes that, in light of the fact Ms. Harkins has not received a discharge, Mr. McCrary's fee is excessive within the meaning of § 329(b). Since he has already in effect disgorged $650, the Court will order the remainder of the fee, or $600, to be disgorged and paid to the Trustee for the benefit of Ms. Harkins' estate within 14 days.[38] The Court also directs the Trustee to credit the $600 against the amount Ms. Harkins owes the estate.

### Sanctions Under § 707(b)(4)(D) For the Failure to Make Reasonable Investigation and Proper Disclosures

With respect to § 707(b)(4)(D), Mr. McCrary's signature on Ms. Harkins' petition constituted his certification that he had no knowledge after an inquiry that the information in the schedules filed with the petition was incorrect.[39] As noted above, the Court does not believe Mr. McCrary's explanation that he instructed Ms. Harkins to spend $5,000 to complete the household repairs in two weeks. His explanation is belied by his own interjections at the first § 341 meeting, at which it was clear he knew about the money but thought somehow it did not have to be disclosed because it was "loss-payee money" and because Ms. Harkins had kept it "segregated" – overlooking the fact that keeping undisclosed cash in a safe in an undisclosed location is nonetheless improper.

If Mr. McCrary had truly believed Ms. Harkins' employer was holding the funds for her benefit, he still had the duty to ensure the cash was scheduled on the Schedule B; Schedule B

---

[37]     Mr. McCrary did not present evidence at trial that he had previously disgorged the entire fee, as he alleged in his response to the UST's first Motion.

[38]     Mr. McCrary's response to the UST's motion to compel disgorgement did not raise as a defense that he had already disgorged half of his attorney fee; however, since it is undisputed that he has paid $650 from his fee to the Trustee, the Court believes ordering disgorgement of in effect $1,850 – or more than his fee – would not be appropriate; there is no basis in § 329(b) to order disgorgement of more than what an attorney received under his fee agreement. The Court also notes that Ms. Harkins has apparently agreed that the disgorgement be made in favor of the estate, and not to her.

[39]     It is not disputed that Ms. Harkins' debts are primarily consumer debts, such that Mr. McCrary's representation falls within the requirements of § 707(b)(4).

clearly instructs that "[i]f the property is being held for the debtor by someone else, state that person's name and address under 'Description and Location of Property.'" Conversely, if Mr. McCrary thought Ms. Harkins was holding the funds for the benefit of the mortgage company, he would have disclosed the funds in response to SOFA Question 14, "Property held for another person." And, Mr. McCrary by his own admission stated that he did not call Ms. Harkins to verify whether she had spent the funds before he filed her case. The Court thus concludes that Mr. McCrary violated his duty to make a reasonable inquiry under § 707(b)(4)(D).

The Trustee presented no evidence of his fees and expenses in the *Harkins* case. In reviewing the history of the case, however, it is obvious that the Trustee spent significant time attempting to locate and secure the cash, all of which would have been unnecessary had the cash been disclosed initially. In addition, the failure to investigate occurred after Mr. McCrary had already failed to reasonably investigate in *Pigg* and Mr. McCrary agreed on the record that $3,750 was a reasonable civil penalty that he was prepared to pay.

Ms. Harkins, like Ms. Pigg, is an unsophisticated young woman with small children, including an infant born just several weeks before she filed, with minimal assets and minimal wages from her cleaning job. It is unlikely she can save sufficient funds to compensate the Trustee the sum of $5,000.[40] Given Mr. McCrary's violations of § 707(b)(4)(D) – admitted and otherwise – the Court agrees with the UST that a civil penalty  in the amount of triple his attorney fee, or $3,750, is reasonable in order to both deter future violations and compensate the

---

[40]     Although both Mr. McCrary and Ms. Harkins represented that $5,000 was in the lockbox on the filing date of August 15 and $1,500 was left on the date of the § 341 meeting, it is not that clear to the Court. Ms. Harkins seemed confused about when she signed the petition and when she filed, and even the date of the first meeting of creditors. Ms. Harkins' accounting showed she spent almost $8,000 in cash for food, clothing, utilities and baby items over the course of two months, but since she did not keep receipts, neither she nor the Court is clear about when she started spending the cash and when she stopped. However, since all parties appear to accept that $5,000 was in the box as of August 15, and the Court has no evidence to the contrary, the Court accepts that Ms. Harkins owes $5,000 to the estate.

estate for its loss.[41] Mr. McCrary is therefore ordered to pay $3,750 to the estate within 14 days

as a sanction for his violations of § 707(b)(4)(D).

### Court's OSC

The Court set May 7, 2015 as the first hearing date on the UST's motion for

disgorgement and sanctions in the *Harkins* case. Mr. McCrary was personally instructed by this

Court's Courtroom Deputy that he needed to appear. Yet Mr. McCrary filed a motion "to rule on

the pleadings" or in the alternative to continue the hearing shortly before the hearing. The motion

"to rule on the pleadings" falsely represented that he had consented to all relief in the UST's

motion, when in fact he had denied the essential allegations and had not paid the sanctions he

consented to pay. In the alternative, Mr. McCrary requested a continuance of the hearing, but the

continuance request failed to comply with L.R. 9060-1[42] in that it was filed untimely; did not

represent that he had sought to contact opposing counsel; and was not accompanied by a call or

email to the Courtroom Deputy to inform her of the continuance request. In addition, the Motion

stated that he had been unable to determine whether Ms. Harkins had consented to the Court's

jurisdiction, but that he had asked she contact the Trustee directly to communicate her consent.[43]

Given that Mr. McCrary's Motion was untimely, noncompliant, without legal or factual

basis, and appeared to admit he had abandoned his client without seeking leave to withdraw, and

that he had not appeared at a hearing after being directed to do so, the Court issued its OSC

setting out those failures and apparent violations of Rule 9011(b)(1), (2), and (3). The OSC

directed Mr. McCrary to show cause why additional sanctions in the form of attorney fees to

---

[41]      In reality, $3,750 will not fully compensate the estate, given the additional time and expense the Trustee
had to spend pursuing this matter. Since the Trustee supports the treble sanction, however, the Court will as well.

[42]      L.R. 9060-1 requires motions to continue to be filed two business days before the hearing unless the need
for the continuance arises within the two business days.

[43]      The appropriateness of advising a client for whom you are still counsel of record to contact the opposing
counsel will be discussed below.

reimburse the Trustee and UST should not be imposed. Mr. McCrary did not respond to the

Court's OSC, or to the subsequent OSC expressly ordering him to respond.

The UST filed a Notice of Statement of Fees, requesting fees of $612.50, and mileage

expenses of $61.60, or a total of $674.10. The Trustee's Statement requested fees of $775 plus

mileage expenses of $50.40, for a total of $825.40. Both Statements properly itemize the time

spent preparing for and attending the hearing, and both properly charged travel time at one-half

the hourly rate. Both Statements were filed pursuant to the Court's deadline, to allow Mr.

McCrary reasonable time to review and object. Mr. McCrary did not object to either Statement.

The Court has reviewed both Statements, however, and finds that the hourly rates of the UST and

Trustee ($175 and $250/hour, respectively) are reasonable; that the time spent was reasonable;

and that the expenses are reasonable.

At the final hearing, the Court informed Mr. McCrary that the Eighth Circuit did not

authorize the Court to impose attorney fees as sanctions on the Court's own motion under Rule

9011.[44] Mr. McCrary responded that it was still his desire to reimburse the UST's and the

Trustee's attorney fees and expenses.

Section 105 gives bankruptcy courts broad power to implement the provisions of the

Code and to prevent an abuse of the bankruptcy process, which includes the power to sanction

counsel. *Gargula v. Bisges* (*In re Clink*), No. 10-21489, 2013 WL 1741945, *5 (Bankr. W.D.

---

[44]     *E.g., Welk v. GMAC Mortg., LLC*, 850 F. Supp. 2d 976, 1006 (D. Minn. 2012). The Eighth Circuit also
requires the attorney have the due process opportunity to understand what provisions of law a court is relying on in
support of the sanctions. *E.g., Nat'l Bank of Arkansas in North Little Rock v. Parks*, 970 F.2d 480, 483 (8th Cir.
1992). Sanctions in the form of attorney fees to reimburse opposing parties are authorized under § 105(a) and the
Court's inherent power, and it was the Court's intent in issuing the OSC to rely on Rule 9011 and its other statutory
and equitable powers, although the Court should have stated so expressly in its Order. The Court believes Mr.
McCrary received due process notice of the Court's intent to sanction him under its equitable powers, based on the
OSC itself as well as the Court's statements at the pretrial status conference. As a practical matter, however, Mr.
McCrary has waived the right to challenge the Court's authority to sanction him in the form of ordering
reimbursement of opposing parties' attorney fees, for two reasons. First, he failed to respond to either of the Court's
two OSC. And second, he agreed to the reimbursement sanction even after the Court advised him the law in the
Eighth Circuit did not appear to authorize it based on a narrow reading of the OSC.

Mo. Apr. 23, 2013), *aff'd,* 497 B.R. 44 (W.D. Mo. 2013), *aff'd,* 770 F.3d 719 (8th Cir. 2014) (citing *In re Triepke,* No. 09-21855, 2012 WL 1229524 (Bankr. W.D. Mo. Apr. 12, 2012)). Sanctions are meant to serve the dual purposes of deterrence and compensation – to deter repetition of such conduct and to compensate for the reasonable costs incurred as a result of that conduct. *Id.* (citing *In re Triepke*, 2012 WL 1229524).

The Court therefore concludes that Mr. McCrary violated Rule 9011(b)(1) by filing a motion for the improper purpose of avoiding appearance at a hearing at which he knew he had been directed to appear. Mr. McCrary also violated Rule 9011(b)(2) and (b)(3) by filing a motion without legal or factual support; he falsely represented that he had consented to all relief in the UST's motion and falsely represented that he no longer represented Ms. Harkins. Under the Court's inherent authority and § 105, the Court believes that it is appropriate to sanction Mr. McCrary and directs him to pay $825.40 to the Trustee and $674.10 to the Office of the UST within 14 days, such amounts representing a reasonable fee to compensate those parties for their time in appearing at a hearing at which nothing could be accomplished in light of Mr. McCrary's failure to appear. In light of Mr. McCrary's agreement to pay these amounts and his acknowledgement that he continues to represent Ms. Harkins, the Court does not believe that further sanctions for Mr. McCrary's failure to appear or respond are necessary.

### Summary of Monetary Sanctions

In the *Pigg* case, the Court orders that Mr. McCrary disgorge $1,300 of his attorney fees pursuant to § 329(b), and pay a penalty pursuant to § 707(b)(4) of $1,500, for a total of $2,800. In the *Harkins* case, the Court orders that Mr. McCrary disgorge $600 of his attorney fees pursuant to § 329(b), and pay a penalty of $3,750 pursuant to § 707(b)(4), for a total of $4,350. In addition, the Court orders that Mr. McCrary reimburse the UST $674.10 and the Trustee

$825.40 pursuant to § 105(a) and Rule 9011, for a total of $1,499.50. The total of $8,649.50 is ordered to be paid within 14 days.  Any amounts Mr. McCrary has already paid should be credited against these amounts.[45] Separate orders will issue.

### Discussion of Referral for Professional Discipline For Actions in Pigg & Harkins Cases

The UST did not specifically request that the Court impose nonmonetary sanctions against Mr. McCrary.[46] Nonetheless, this Court has a duty to refer a lawyer who has violated the MRPCs to disciplinary authorities, as well as the inherent power to impose discipline against those lawyers admitted to practice before it. Such discipline may range from a mild sanction, such as a reprimand, to severe sanctions, such as a suspension.[47]  Given the seriousness of Mr. McCrary's admitted deceit and dishonesty in two cases, the Court believes it is appropriate to examine whether disciplinary measures are warranted.

### Significance of the False Schedules & SOFA Answers

At the threshold, a discussion of why the false SOFA in the *Pigg* case and the false Schedule B in the *Harkins* case so trouble this Court is important.

The bankruptcy process – and Chapter 7 in particular – is carefully designed to strike a balance between a number of competing principles. There is the policy of allowing the honest debtor a fresh start; but that policy must be balanced against the need of the trustee and creditors to have an opportunity to challenge whether the debtor deserves a fresh start. The trustee in particular has a duty to investigate the debtor's assets, liabilities, and financial affairs. If the

---

[45]    The Trustee said in closing that he had just received a check for $2,800 from Mr. McCrary to be applied to the *Pigg* estate.

[46]    *See Gargula v. Bisges (In re Clink)*, 770 F.3d 719 (8th Cir. 2014) (order referring attorney for  professional discipline affirmed on appeal).

[47]    *See, e.g., In re Miller Auto. Group, Inc.*, 521 B.R. 323 (Bankr. W.D. Mo. 2014) (suspending lawyer indefinitely from practicing law in the bankruptcy court for the Western District of Missouri for numerous Code and Rule violations); *Young v. Young* (*In re Young*), 789 F.3d 872 (8th Cir. 2015) (affirming six month suspension for intentionally deceptive conduct by lawyer).

trustee discovers assets, then the trustee has a duty to liquidate the assets of the estate for distribution to creditors, and is commanded by the Bankruptcy Code to "close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). A Chapter 7 trustee receives only $60 from the debtor's filing fee of $335 to commence that investigation, and only receives compensation to the extent nonexempt assets are collected and liquidated. 11 U.S.C. § 326.[48]

To that end, the proper administration of any bankruptcy case is utterly dependent upon the debtors and their counsel providing complete, accurate and truthful information about the debtor's assets, debts, and financial affairs. *In re Smith*, No. 13-31565, 2014 WL 128385, *5 (Bankr. E.D. Va. Jan. 14, 2014). Indeed, the Eighth Circuit, noting the sheer volume of bankruptcy cases and hearings, recently observed that "[t]he potential for mischief to be caused by an attorney who is willing to skirt ethical obligations and procedural rules is enormous." *Young*, 789 F.3d at 879 (8th Cir. 2015) (quoting *In re Armstrong*, 487 B.R. 764, 774 (E.D. Tex. 2012). In *Young*, the Eighth Circuit affirmed the bankruptcy court's six-month suspension from practice of a debtor's attorney who misrepresented certain facts in an effort to obtain confirmation of the debtor's plan. *Id*. at 883.

A bankruptcy attorney's obligations thus extend beyond merely "shuffling papers and charging fees." *In re Smith*, 538 B.R. 867, 875 (Bankr. M.D. Ala. 2015). It is not enough, then, that bankruptcy schedules and statements are signed by the debtor under penalty of perjury.[49] Or that a person who knowingly and fraudulently conceals assets from a bankruptcy trustee or makes a false oath in or in relation to a case under title 11 is guilty of a bankruptcy crime. 18 U.S.C. § 152(1), (2). Or that the same conduct may form the basis for denying a debtor a

---

[48]    *See also Law v. Siegel*, 134 S. Ct. 1188 (2014) (discussing limitations on trustee's ability to surcharge exempt property for his expenses in investigating the debtor's fraudulent lien).

[49]    *See* Fed. R. Bankr. P. 1008.

discharge. 11 U.S.C. § 727(a)(2), (a)(4). Rather, because of the important role debtors' attorneys

serve in assisting their clients in filing complete, accurate, and truthful schedules and statements,

"Rule 9011 is critical for the bankruptcy system to function." *Young*, 789 F.3d at 879. And Rule

9011, in addition to the Court's inherent powers, authorizes the Court to impose a number of

nonmonetary sanctions. Fed. R. Bankr. P. 9011(c)(2).

In this case, by his own admissions and the undisputed evidence, Mr. McCrary has

violated at least six provisions of the Missouri Rules of Professional Conduct ("MRPC"). The

violation of each Rule – and its detrimental impact on the clients and the administration of the

bankruptcy system – will be discussed in turn.

### *(1)    MRPC 4-1.4 Communication*

MRPC 4-1.4(b) requires that a lawyer explain a matter to the extent reasonably necessary

to permit the client to make informed decisions.  In the *Pigg* case, Mr. McCrary admitted that he

did not counsel Ms. Pigg that her transfers to the family members were avoidable. Although Mr.

McCrary did not admit he improperly counseled Ms. Harkins, the Court has made a finding of

fact that he also failed to counsel Ms. Harkins. Why was it critical that Mr. McCrary counsel Ms.

Pigg about the transfers once he learned about them and before he filed Ms. Pigg's bankruptcy

case?  Why was it critical he likewise counsel Ms. Harkins? What "informed decisions" did they

need to make in connection with the filing of their respective bankruptcy cases?

First, the existence of nonexempt assets and avoidable transfers may impact a debtor's

decision about which bankruptcy chapter to file or whether to file bankruptcy at all.   The

existence of avoidance transfers in particular means that the trustee will have a duty under § 704

to (1) investigate transfers; and (2) if appropriate, sue the family members. Many debtors do not

want to file bankruptcy if it means they will lose assets or that their family members will not only find out about the bankruptcy, but may be sued as well.

Second, the existence of assets and avoidable transfers impacts the complexity and length of the case. A typical "no-asset" bankruptcy case is discharged and closed within three to four months. An asset case, however, takes much longer to administer. If the trustee is successful in collecting a judgment against family members (or any other transferees, for that matter), he or she will then also re-examine other assets to see if those assets can likewise be liquidated and added to the estate for distribution to creditors.

For example, many debtors have nonexempt cash, jewelry, cars, tax refunds, or other assets that, alone, are of insufficient value for a trustee to administer. If the trustee is successful in recovering a voidable transfer, however, then the trustee will have a duty to collect these other assets, many of which the debtors may have been hoping to keep. And, once a bankruptcy estate is opened, it may take months or even years before even the most expeditious of trustees is able to complete his or her duties and close the case. In the meantime, even though the debtor may have received a discharge, the debtor will have the duty to continue to cooperate with the trustee until the estate is closed, a process that may be time-consuming and wearing on the debtor, who will not truly have the "fresh start" until the bankruptcy case is over. Consider the cases of both Ms. Pigg and Ms. Harkins – now going on 18 months.

Most importantly, both Ms. Pigg and Ms. Harkins had legal options. In the case of Ms. Pigg, she might have decided to wait to file bankruptcy until after the transfers were no longer recoverable, a year and a day in the case of insider preferences. 11 U.S.C. § 547(b)(4)(B). Ms. Harkins may have waited until the home repairs were finished. Either might have decided to file a Chapter 13 bankruptcy case, proposing a plan to pay the value of the cash or transfers to the

creditors in lieu of a Chapter 7 trustee seizing the cash or suing family members. 11 U.S.C. § 1325(a)(4).

Another option for Ms. Pigg – if handled correctly – might have been to have the family members reloan Ms. Pigg the money, to take advantage of the "new value defense" to avoidable preferences. 11 U.S.C. § 547(c)(4). It is likely, given Ms. Pigg's financial situation based on her schedules (very modest income, relatively few possessions, three young children, old cars, no retirement) that a bankruptcy lawyer could easily have assisted Ms. Pigg in spending down any reloaned money in appropriate ways that would have benefitted her and her children and which would not have resulted in avoidable transfers. *See, e.g., Upstate Fed. Credit Union v. Carletta (In re Carletta)*, 189 B.R. 258, 261 (Bankr. N.D.N.Y. 1995) (legislative history supports conversion of nonexempt assets before filing). Yet another option may have been to obtain Ms. Pigg's agreement to settle with the Trustee and to pay the money back from some other sources, such as her post-petition wages or the exempt portion of her tax refunds, to protect the family members from being sued.

Of course, some clients do not care to avail themselves of any options and instead choose to file anyway and deal with the ramifications of avoidable transfers or nonexempt assets. Determining which option is best for a particular client under particular circumstances is beyond the purview of the Court.[50] What is clear, however, is that Mr. McCrary's failure to counsel Ms. Pigg and Ms. Harkins deprived them of the ability to make an informed decision, and thus not only violated MRPC 4-1.4, but the Code[51] and the RRA[52] as well.

---

[50]    Certainly every case is different, and what advice may be appropriate in various circumstances varies widely depending on a number of factors, including the facts, the interests of the client, the law in the particular jurisdiction, among other relevant factors. The foregoing options are not intended to be offered as an advisory opinion and are not exclusive.
[51]    11 U.S.C. § 526(a)(3)(B) requires a "debt relief agency" to accurately represent "the benefits and risks that may result if [the prospective client] becomes a debtor." Mr. McCrary is considered to be a "debt relief agency"

### (2)    MRPC 4-1.3 Diligence

MRPC 4-1.3 imposes a duty upon lawyers to act with reasonable diligence and promptness in representing a client. Reasonable diligence as it relates to representation of Chapter 7 debtors such as Ms. Pigg and Ms. Harkins is a concept that bears examination.

Comment 3 to Rule 4-1.3 states that "[p]erhaps no professional shortcoming is more widely resented than procrastination." Comment 3 points out that even when the client's interests are not affected in substance, unreasonable delay causes a client "needless anxiety" and "undermine[s] confidence in the lawyer's trustworthiness." Rule 4-1.3, Comment [3].

In both of these cases, Mr. McCrary exhibited a notable lack of diligence in protecting Ms. Pigg's and Ms. Harkins' interests. His failure to promptly file amended schedules in Ms. Pigg's case after the transfers were discovered at the § 341 hearing needlessly extended her discharge deadline. His failure to follow up with Ms. Harkins in the two weeks after she signed the petition and before he filed the case led directly to the inaccuracies in the Schedules. And a prompt response to the Trustee's emailed request for more information about the insurance proceeds may have resulted in less loss to the estate and less anxiety for Ms. Harkins. Again, the bankruptcy courts are courts of volume, and lawyers who fail to diligently respond to trustees' requests for information not only fail their debtor clients by jeopardizing their discharges, but needlessly bog down the system.

### (3)    MRPC 4-1.5 Fees

MRPC 4-1.5 forbids a lawyer from making an agreement for, charging, or collecting an unreasonable fee. Mr. McCrary admitted in both cases that his fees were excessive under § 329

---

subject to the requirements of §§ 526–528. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 (2010) (debtor's attorneys held to be "debt relief agencies" under the Code).
[52]    The RRA requires that an attorney "[c]ounsel [the debtor] regarding the advisability of filing either a chapter 13 or a chapter 7 case, discuss bankruptcy procedures, and answer [the debtor's] questions."

of the Bankruptcy Code. An excessive fee is not a reasonable fee under MRPC 4-1.5. *Redding*,

247 B.R. at 478.

### (4)     *MRPC 4-3.3 Candor Toward the Tribunal*

MRPC 4-3.3(a)(1) provides that a lawyer shall not knowingly make a false statement of

fact to a tribunal or fail to correct a false statement of material fact. Subsection (a)(3) of MRPC

4-3.3 prohibits a lawyer from knowingly offering evidence that the lawyer knows to be false and

requires the lawyer to take reasonable remedial measures upon learning of the evidence's falsity.

And MRPC 4-3.3(b) requires a lawyer representing a client in an adjudicative proceeding and

who knows that a person is engaging in criminal or fraudulent conduct related to the proceeding

to take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

The significance of a violation of MRPC 4-3.3(a)(1) in a bankruptcy case should be

obvious. As noted above, bankruptcy schedules and statements are signed by a debtor under

penalty of perjury.  A person who knowingly and fraudulently conceals assets from a bankruptcy

trustee or makes a false oath in or in relation to a case under title 11 is guilty of a bankruptcy

crime. 18 U.S.C. § 152(1), (2).  And the same fraudulent conduct may also form the basis for

denying the debtor a discharge. 11 U.S.C. § 727(a)(2), (a)(4). Thus, when a debtor's attorney

knowingly advises a client to lie or conceal assets in connection with a bankruptcy case – or even

merely turns a blind eye to a potential lie or concealment – the results may be potentially

disastrous to the bankruptcy client.

Turning back to the false Schedules and SOFA in these cases: The purpose of the

Schedules and SOFA, and SOFA Questions 3.a, 3.b and 10.a in particular, is to allow the trustee

to investigate assets and to determine whether transfers may be recovered for the benefit of

creditors of the bankruptcy estate. *See, e.g,* 11 U.S.C. §§ 544, 545, 547, 548, 553. The purpose of

45

the § 341 meeting, likewise typically conducted in volume fashion, is to allow the trustee and creditors to question the debtor about assets, liabilities, and financial affairs, including whether there are avoidable transfers.

Thus, for Mr. McCrary to knowingly advise a client to lie on bankruptcy schedules and statements is a transgression not only against his client, the Trustee, and the creditors,  but against the integrity of the bankruptcy process itself, the seriousness of which cannot be overstated.

Here, Mr. McCrary's actions in both the *Pigg* and *Harkins* cases violate three of the provisions of MRPC 4.3.3. Mr. McCrary knowingly made a false statement of fact in filing a false SOFA in Ms. Pigg's case and a false schedule in Ms. Harkins's. *See* MRPC 4-3.3(a)(1). Mr. McCrary has never corrected the false statement of fact in Ms. Harkins' case. *See* MRPC 4-3.3(a)(1). By allowing both clients to testify falsely under penalty of perjury that their schedules and statements were correct, Mr. McCrary also offered false evidence at the § 341 meetings. *See* MRPC 4-3.3(a)(3). And, knowing that the false statements in the schedules and statements constituted both fraud and a potential crime, Mr. McCrary should have taken reasonable remedial measures rather than, particularly in Ms. Harkins' case, effectively obstructing the Trustee's attempts to investigate the cash. MRPC 4-3.3(b). Since Mr. McCrary has admitted these actions, and the facts are otherwise undisputed, it is clear that Mr. McCrary violated MRPC 4-3.3(b).

*(4)    MRPC 4-3.4 Fairness to Opposing Party and Counsel*

MRPC 4-3.4(b) provides that a lawyer shall not counsel or assist a witness to testify falsely. Here, Mr. McCrary admitted he counseled Ms. Pigg not to disclose the transfers to her family members; the Court has concluded that he likewise advised Ms. Harkins to lie about the

cash, then told her to tell the Trustee she had been advised to spend down the cash before filing when he had never so advised her. The Court likewise concludes that Mr. McCrary violated MRPC 4-3.4(b).[53]

### (5)    *MRPC 4-4.1 Truthfulness in Statements to Others*

MRPC 4-4.1 provides that, in the course of representing a client, a lawyer shall not knowingly make a false statement of material fact to a third person or fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client. Here, Mr. McCrary lied when he told the Trustee after the § 341 meeting that he had no knowledge of Ms. Pigg's transfers to family members, since he has since admitted that he did know. That lie violates MRPC 4-4.1.[54]

### (6)    *MRPC 4-8.4 Misconduct*

MRPC 4-8.4(c) states that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. The Missouri Supreme Court has in fact cited the importance of honesty and integrity as chief among the virtues that the public has the right to expect of any lawyer. *See In re Carey*, 89 S.W.3d 477, 498 (Mo. banc. 2002) (citation omitted). Questions of honesty go to the heart of fitness to practice law. *In re Donaho*, 98 S.W.3d. 871, 874 (Mo. banc. 2003) (citation omitted). The Court believes Mr. McCrary's actions in these two cases exhibit a lack of honesty and integrity, for at least four reasons.

### *Lack of Any Credible Explanation*

---

[53]    As noted earlier, the Court believes that Mr. McCrary may also have violated Rule 4-1.6 by turning over Ms. Pigg's file to the UST, but does not have sufficient evidence in the record to conclude there is a substantial question reflecting on his honesty under Rule 4-8.3. Such a substantial question would make referral to the disciplinary authorities mandatory. *See* MRPC 4-8.3(a), (c).

[54]    It is a close call in the Court's mind about whether Mr. McCrary's statements to the Trustee in the Harkins case at the § 341 meetings and in the emails constituted knowing misrepresentations.

First is the failure to offer any credible explanation for his behavior. In the *Pigg* case, he told the Trustee that it was an oversight and then that he did not know about the transfers; his explanation to the Court was that he thought the transfers did not have to be disclosed. But his admissions in his response to the UST's Motion belie that explanation. The shifting explanations and failure to respond to the Trustee in the *Harkins* case are equally troubling. For Mr. McCrary to change his story only after he learned his "offer" to pay the sanctions would not excuse him from attending a hearing in mitigation of a referral for discipline speaks volumes about what he really believes.[55]

### The Impact of the Admitted Failure to Counsel The Clients

Second is the failure to offer any credible explanation when examined in conjunction with his admitted failure to counsel his clients. Why would a competent, experienced lawyer who admits he knew certain assets and transfers had to be disclosed likewise admit he did not counsel the clients about the failure to disclose those assets and transfers and otherwise offer no explanation to the Court for the failure? From the perspective of a bankruptcy judge, there is only one logical explanation: that of greed and laziness.

The Court has discussed the fact that nonexempt assets and avoidable transfers complicate and delay what would otherwise be a simple Chapter 7 case – from the perspective of

---

[55]     The Court does not believe Mr. McCrary for another reason: his statements at the hearing were belied by his correspondence to his client. Exhibit 1 also contains a letter Mr. McCrary sent to Ms. Pigg dated February 27, 2014. The letter states that she will need to list *all assets and all creditors including those you intend to keep paying*. Counsel for the UST referred to this letter as a retention letter, and Mr. McCrary corrected her, saying that it was "not a retention." Clearly, however, under both Missouri law and the Bankruptcy Code, an attorney-client relationship formed based on the fact that Mr. McCrary was giving an "assisted person" legal advice (otherwise known as "bankruptcy assistance") about filing bankruptcy. *See* 11 U.S.C. §§ 101(3), 101(4)(A),  527. As noted previously, Mr. McCrary was a "debt relief agency" and his providing of "bankruptcy assistance" triggered the duties under § 527(a) to provide within 3 business days written disclosures further detailing the requirement that all assets and liabilities be disclosed. The UST did not request sanctions under § 526(c)(2), however, so this Court makes no findings with respect to whether Mr. McCrary's letter may have violated § 527(a) and (b) with respect to the mandatory disclosures.

the Chapter 7 debtor. But what is not so obvious is the impact on debtors' lawyers and their typically "flat" fees for the representation.

The vast majority of Chapter 7 bankruptcy cases are filed as "no asset" cases. Indeed, creditors are given express notice by the Court in the notice of commencement not to file claims unless notified to do so.[56] A typical Chapter 7 bankruptcy case is discharged and closed within three or four months after it is filed, and most bankruptcy lawyers' duties to the debtor client end when the case is closed.

But in a case in which a trustee discovers assets, the estate remains open for a much longer period of time. As noted above, Chapter 7 trustees have fiduciary duties to recover assets for the benefit of creditors. 11 U.S.C. § 704(a).  Once a trustee discovers assets and "opens" a bankruptcy estate, it takes months and sometimes years for even the most expeditious of trustees to liquidate the assets, sort through and object to the creditors' proofs of claim, file final estate tax returns, file a final report of a proposed distribution to creditors, and then actually distribute the funds and "close" the estate. In the meantime, a debtor – and thus the debtor's attorney –  still has a duty to cooperate with the trustee until the trustee finishes his duties. And, an attorney should continue to monitor the bankruptcy case on his client's behalf so long as it remains open, even though the debtor in the meantime may have received a discharge.[57]

Thus, even if Mr. McCrary had explained the options to Ms. Pigg and Ms. Harkins and they had agreed to file their cases immediately with disclosure of the transfers and cash, Mr.

---

[56]     *See, e.g., Docket No. 8 in the Pigg case.*

[57]     For example, it may be in a debtor's best interest to make sure that certain creditors file proofs of claim to be able to share in the trustee's distribution of funds. A debtor might want a family member to file a claim, or a student loan creditor, or holders of other nondischargeable debts. If those creditors do not file claims, debtor's counsel may file claims on their behalf. Fed. R. Bankr. P. 3004.  In certain circumstances, such as when there is a possible surplus, debtor's counsel may want to object to claims; otherwise, the debtor has no standing to object. *See generally Robb v. Harder ( In re Robb)*, 534 B.R. 354 (8th Cir. B.A.P. 2015).  The debtor may also want to monitor the trustee's sale or abandonment of assets, as well as any tax ramifications that might flow therefrom. These are just a few of the many reasons that debtors' counsels' duties to the debtor client do not (and should not) terminate just because the discharge order has been entered.

McCrary would have been duty-bound to continue his representation at his quoted flat fee rate until the Court entered the final decree signifying the close of the cases and the end of Mr. McCrary's representation. That delay and extra time to monitor a case the lawyer expected to be a "no-asset" case until conclusion means, sometimes, that debtors' lawyers effectively make nothing when a case takes an unexpected turn.

### *Additional Observations Regarding the Proper Counseling of Consumer Debtors*

But it also takes time to do a proper counseling of a consumer debtor client. The Court knows from her own experience in private practice and from the matters that come before her that representing debtors is difficult work. It is difficult and time-consuming to explain to generally unsophisticated consumers all the information the Bankruptcy Code deems necessary.[58] But the difficulty of the explanations and the time it takes to give those explanations expand exponentially upon the attorney's belated discovery of previously undisclosed assets or avoidable transfers – and even more so when the discovery is made on the eve of an anticipated filing.[59]

Attorneys who learn of previously undisclosed assets or transfers may not simply turn a blind eye. Setting aside for a moment the attorney's duty to reasonably investigate assets and the attorney's signature as a certification that he has performed that duty under § 704(b), ethical duties are implicated as well. Debtors filing Chapter 7 bankruptcies are generally seeking a

---

[58]    Sections 526(a)(3)(B) and  527(b) require explanation of "all the benefits and risks" of filing bankruptcy, as well as certain disclosures and other information. Section 526(c)(2)(A) imposes penalties such as disgorgement and actual damages if an attorney "intentionally or negligently" fails to comply.

[59]    The same is true if the attorney discovers that a client has continued to charge on credit cards, for example, since certain charges within certain time frames are presumed nondischargeable.  11 U.S.C. § 523(a)(2)(C). Interestingly, Mr. McCrary's letter to Ms. Pigg advised her to stop charging on her credit cards; why didn't he likewise advise Ms. Pigg at the outset not to spend down her substantial tax refund until he had the opportunity to consult with her about the ramifications?

discharge of their debts, maximization of the assets they may keep, and a "fresh start."[60] In keeping with those objectives, it is unethical for an attorney to ignore undisclosed assets or transfers since to do so limits the scope of what the debtor hopes to achieve in a bankruptcy representation under MRPC 4-1.2.

In addition to the attorney's § 704(b) statutory duties, the debtor's attorney is ethically obligated to explain the ramifications to the client "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." MRPC 4-1.4(b). Thus, upon discovery of this information, the debtor's attorney not only must conduct a further investigation, but must explain the ramifications in a manner sufficient to allow the debtor to make an informed decision about what to do.[61]

If the ramifications of avoidable transfers are thoroughly and accurately explained to a bankruptcy client, then the typical client will have a plethora of questions, to all of which the Bankruptcy Code, the RRA, and the MRPCs will demand answers and further explanations, such as: I was ready to file today – what do I do with my bank account balances if I have to wait to file bankruptcy? If I wait to file, how will I be able to hold off my creditors and prevent them from suing and collecting from me in the meantime? Will you hold them off for me? Will that service cost extra? How long will I have to wait? If I wait to file until farther along in the year, will more of my anticipated tax refund become an asset the Trustee will take?

---

[60]    Numerous cases discuss the concept of the fresh start for the honest debtor. *E.g., Harris v. Viegalahn*, 135 S.Ct. 1829, 1835 (2015); *Clark v. Rameker*, 134 S.Ct. 2242, 2244 (2014); *Schwab v. Reilly*, 560 U.S. 770, 791 (2010).

[61]    "The duty of reasonable inquiry imposed upon an attorney requires the attorney (1) to explain the requirement of full, complete, accurate, and honest disclosure of all information required of a debtor; (2) to *ask probing and pertinent questions designed to elicit full, complete, accurate, and honest disclosure of all information required of a debtor;* (3) to check the debtor's responses in the petition and Schedules to assure they are internally and externally consistent; (4) to demand of the debtor full, complete, accurate, and honest disclosure of all information required before the attorney signs and files the petition; and (5) to seek relief from the court in the event that the attorney learns that he or she may have been misled by a debtor."  *In re Robinson,* 198 B.R. 1017, 1024 (Bankr. N.D. Ga.1996) (citations omitted) (emphasis added).

But the questions and concomitant explanations do not stop with the possibility the client may agree to wait to file bankruptcy until, for example, the time for a trustee to sue a family member for an avoidable or even fraudulent transfer expires. The client likely will ask:  If I go ahead and file now, how and why is the Trustee able to sue my family members? How and why is the Trustee now going to take my remaining nonexempt assets, such as my small amounts of cash or money in the bank? How and why is the Trustee going to want a pro rata portion of my tax refund for this year when I haven't even filed my tax return yet? How and why will my bankruptcy not be finished when I get my discharge within three to four months but will instead not be done for many months and maybe years? How and why will I have a duty to cooperate with the Trustee until he is finished with me? How will I know when he is finished with me? How will the bankruptcy estate being open for so long impact the creditors I am reaffirming with? How will it impact my ability to rebuild my credit? And so on, and so on.

The implication here is that Mr. McCrary simply did not want to counsel the clients because he did not want to spend the time answering their likely questions.

### *Lack of Remorse or Contrition*

The third fact bearing on the issue of honesty and integrity is Mr. McCrary's lack of remorse or contrition.  Mr. McCrary said in his opening statement that "this would be the first of many apologies."  Yet, Mr. McCrary never in fact got around to apologizing to the Trustee or the Court (or his client) until after the Trustee noted the lack of apology in his closing argument. Mr. McCrary's apology at that late point rang hollow.

More importantly, Mr. McCrary's attempts to portray remorse were patently not credible. The Court buttresses this finding and conclusion based on its observations of Mr. McCrary during the hearing. Mr. McCrary's behavior was not that of someone expressing sincere regret

for a mistake, but that of someone sincerely regretting he had been caught. The Court observed Mr. McCrary's long pauses before answering even simple questions; his rambling and unclear answers; his exaggerated sighs; his red and profusely sweaty face; his looking down and away during much of the proceeding.

By contrast, when the Trustee, again in closing, invited Mr. McCrary to make a statement about the impact a death in the family may have had on him and his practice, Mr. McCrary spoke directly, cogently, and articulately about the many details, albeit never stating that the death of his brother may have caused him to make mistakes in his advice to his clients. The ability to answer cogently when it served his interest, but to fumble and not answer direct questions when it was not, also causes the Court to conclude that Mr. McCrary did not just make a simple mistake in these cases.

### *Possible Further Nondisclosures*

As a final matter with respect to the issue of dishonesty, the Court observes from the evidence at the hearing that Mr. McCrary's nondisclosures have not all come to light. In the *Pigg* case, the Trustee expressed surprise at Mr. McCrary's testimony about a possible payment of $2,000 for the Rainbow vacuum cleaner, saying that was the first time he knew of this possible transfer.  If, on the other hand, Ms. Pigg had stopped payment on a $2,000 check for a vacuum cleaner, then Mr. McCrary should have advised Ms. Pigg she needed to disclose that rather expensive vacuum as part of her household goods and furnishing on Schedule B (no vacuum cleaner was in fact disclosed). If the vacuum cleaner was in fact encumbered by a purchase money lien, the secured creditor should have been disclosed on the Schedule D, not on the Schedule F, and the lien dealt with on the Statement of Intent as required by § 521(a)(2).[62]

---

[62]    The failure to properly comply with the requirements of filing statements of intent for secured creditors is that the stay may lift quickly and automatically, without the client having the opportunity to prepare to surrender the

Other issues troubling to the Court arose during the hearing as well.[63] The testimony revealed that Ms. Pigg has a prepetition personal injury claim of which Mr. McCrary was aware. Mr. McCrary said he advised Ms. Pigg to investigate the claim, yet he has made no attempt to amend the Schedule B to disclose this prepetition asset.[64] Also, Mr. McCrary did mail a check to the Trustee before the hearing for $2,800, apparently intending the check to represent the $1,300 attorney fee disgorgement plus the $1,500 sanction, but did not send any cover letter or explanation, causing the Trustee unnecessary time to track the payment.[65]

### Whether to Impose Discipline On the Court's Own Motion or To Make a Referral

It is apparent to the Court that Mr. McCrary thinks he can buy his way out and avoid any real consequences for the problems his actions caused his clients. And, the Court believes that the record establishes an inference that Mr. McCrary violated far more MRPCs than the ones that were fairly presented in the UST's Motions. Given that the same deceitful and unethical conduct occurred in two cases – and that in neither case was Mr. McCrary was remorseful or able to offer a credible explanation – the Court does not believe that imposing further sanctions in this Court

---

collateral, particularly if it is the type of collateral that the debtor is using on a daily basis. *E.g., In re McMullen*, 443 B.R. 67 (Bankr. E.D.N.C. 2010).

[63]    In addition to issues that arose during the hearing, the Court's review of the *Pigg* case in preparing to write this opinion uncovered other issues. One was the failure to list the original creditor for the Rainbow vacuum, as discussed above. Another is that Farmer's Bank of Northern Missouri filed a secured claim against a 2004 Buick and a 2011 cab Cadet mower; the Buick was scheduled as an asset, but not the mower. A bankruptcy lawyer has a duty to review the loan documents to assist his client in determining what to do with the collateral, as well as to ensure the collateral still exists or whether there may be dischargeability issues in connection with the loan. *See* 11 U.S.C. § 523(a)(2), (a)(6). Even a cursory review of the Bank's loan documents would have revealed the existence of the mower, as well as the fact that Ms. Pigg was supposed to be making payments to the Bank of $492.52 per month and that there was a co-debtor on the loan. The Court assumes Mr. McCrary had some cursory knowledge of the loan since he scheduled the Bank as having a lien in the Buick and scheduled the co-debtor. The Court makes no findings about whether the loan and any payments were accurately disclosed or not, since this issue was not raised before or at trial, and Mr. McCrary had no opportunity to respond.

[64]    The Trustee said that Ms. Pigg told him she is so turned off by the legal system after her experience with Mr. McCrary that she won't even see a personal injury lawyer. Since Ms. Pigg was not present to confirm this sentiment, the Court will not make a finding as to whether or not that is true.

[65]    The UST's Motion requested that the disgorged fee be paid to the estate, rather than returned to Ms. Pigg as contemplated by § 329. The Court understands from the statements of the UST and the Trustee at the hearing that Ms. Pigg did not object to the disgorged fees being paid for the benefit of the bankruptcy estate, since the funds would assist in making the estate closer to whole for the transfers.

would have an educational or deterrent effect on Mr. McCrary. Rather, the Court believes that a referral to the State of Missouri and the Court en banc for the Western District of Missouri will ensure that a full investigation of Mr. McCrary's dishonest and unethical conduct occurs.

### Conclusion

Mr. McCrary's dishonesty in these cases not only exposed his clients to possible criminal prosecution and denial of discharge, but also undermined his clients' confidence in the legal system. His dishonesty not only damaged his clients, but harmed the Trustee, the bankruptcy estates, and the bankruptcy system in ways that are frankly irreparable. This is, in this Court's opinion, a breach of trust "of the highest order," which demands referral in order to "preserve the integrity of the bankruptcy system and the court and to protect the general public from abusive practices and unprofessional conduct of attorneys." *In re Smith*, Case No. 13-31565, 2014 WL 128385 (Bankr. E.D. Va. Jan. 14, 2014).

A separate order will issue.

Dated: November 20, 2015                  /s/Cynthia A. Norton
                                          United States Bankruptcy Judge


Parties to receive electronic notice